

**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**New Case Electronically Filed: COMPLAINT**
**July 22, 2020 09:33**

By: THOMAS A. BARNI 0064555

Confirmation Nbr. 2035672

KENNETH BANKS                                        CV 20 935081

      vs.

                                  **Judge:**  WILLIAM T. MCGINTY

FOUNDATION AUTOMOTIVE CORP., ET AL.

**Pages Filed:**  42

**EXHIBIT A**

**IN THE COURT OF COMMON PLEAS**
**CUYAHOGA COUNTY, OHIO**

| | | |
|---|---|---|
| **KENNETH BANKS** | : | CASE NO. |
| 6310 Stoneridge, D108 | | |
| Pleasanton, California  94588, | : | JUDGE |
| | | |
| Plaintiff, | : | |
| | | |
| v. | : | |
| | | |
| **FOUNDATION AUTOMOTIVE CORP.** | : | **COMPLAINT** |
| 211 Highland Cross Drive, Suite #260 | | |
| Houston, Texas 77073, | : | **(Jury Demand Endorsed Hereon)** |
| | | |
| **KEVIN KUTSCHINSKI** | : | |
| Unknown Address | | |
| | : | |
| **CHUCK KRAMER** | | |
| 20722 Bending Pines Lane | : | |
| Spring, Texas  77379, | | |
| | : | |
| **MOTORCARS HONDA** | | |
| 2953 Mayfield Road | : | |
| Mayfield Heights, Ohio  44118, | | |
| | : | |
| **CHARLES GILE** | | |
| 110 Ashleigh Drive | : | |
| Chagrin Falls, Ohio  44022, | | |
| | : | |
| **TREVOR GILE** | | |
| 110 Ashleigh Drive | : | |
| Chagrin Falls, Ohio  44022, | | |
| | : | |
| Defendants. | | |
| | : | |

Plaintiff, Kenneth Banks ("Banks"), for his Complaint against Defendants, Foundation

Automotive Corp. ("Foundation"), Kevin Kutschinski ("Kutschinski"), Chuck Kramer ("Kramer"),

Motorcars Honda ("Motorcars"), Charles "Chuck" Gile ("C. Gile"), and Trevor Gile ("T. Gile", and collectively "Defendants"), states and alleges as follows:

## INTRODUCTION

1.      Banks is an individual and resident of Pleasanton, California, is in a protected category based on his disability pursuant to Ohio Revised Code (R.C.) § 4112.02, and was a joint employee of Foundation and Motorcars Honda from January 7, 2019 to March 7, 2019.

2.      Foundation is an automotive dealership engaged in the business of selling new and used automobiles. Upon information and belief, Foundation is a Canadian corporation with its headquarters in Houston, Texas. At all times relevant, Foundation was in the process of purchasing two dealerships in Cleveland, Ohio and does business in Cuyahoga County, Ohio.

3.      Upon information and belief, Kutschinski is an individual and resident of Canada. Kutschinski is the President and an employee of Foundation.

4.      Upon information and belief, Kramer is an individual and resident of Texas. Kramer is the Chief Operating Officer and an employee of Foundation.

5.      Motorcars Honda is the registered trade name of Motor Cars, Inc., an Ohio corporation that is headquartered in Cleveland, Ohio and does business in Cuyahoga County, Ohio. Motorcars Honda is an auto dealership engaged in the business of selling new and used automobiles in Cleveland Heights, Ohio.

6.      Upon information and belief, Charles "Chuck" Gile is an individual and resident of Cuyahoga County, Ohio. At all times relevant, Chuck Gile was the co-owner of Motorcars Honda with Trevor Gile.

7.     Upon information and belief, Trevor Gile is an individual and resident of Cuyahoga County, Ohio. At all times relevant, Trevor Gile was the co-owner of Motorcars Honda with Chuck Gile.

8.     Jurisdiction and venue are proper before this Court as the events underlying the Complaint herein occurred in Cuyahoga County, Ohio.

## GENERAL ALLEGATIONS

9.     In December 2018, Banks was happily employed at a stable job as the General Manager of Levittown Ford in Long Island, New York and was not seeking new employment.

10.     Banks is regarded as an exemplary employee with an excellent reputation in the auto industry and received the Automotive News 40 Under 40 Award in 2017 for making a big impact at a new car dealership in the US.  A true and correct copy of the 40 Under 40 Article is attached hereto as Exhibit A.

11.     Upon information and belief, Foundation as part of its efforts to purchase two dealerships, began recruiting Banks as he possessed the requisite experience and expertise in US automotive sales.

12.     In December 2018, Foundation and Banks entered into discussions for Banks to be the General Manager and Managing Partner for two dealerships in Cleveland, Ohio which Foundation was in the process of purchasing.

13.     The two dealerships were Motorcars Toyota and Motorcars Honda, both owned by Motor Cars, Inc. (the "Dealerships").

14.     As part of the submission that Foundation sent to Honda Motor Company requesting approval for the purchase of Motorcars Honda, Foundation presented Banks as a "strong Dealer Principal," touting his "10+ years of industry experience" making him "an expert in

Automotive Operations and Process Development."  A true and correct copy of the "Submission to Honda Motor Company for the Motorcars Honda Buy/Sell" dated December 18, 2018 is attached hereto as Exhibit B, pg. 4.

15.     Foundation's submission to Honda profiled Banks as "highly regarded" and included testimonials from several of his previous colleagues regarding Banks' leadership, positive attitude and enthusiasm. See Exhibit B, pg. 5.

16.      Foundation promoted Banks' expertise and experience as part of the Management Team that would lead the Honda dealership after the sale even though Banks had not yet accepted employment or begun working for Foundation at that time.  See Exhibit B.

17.     Lastly, Banks is a young and successful African American man, and Foundation exploited his minority status to garner favor with Honda who, like other companies, sought out the economic and reputational benefits from hiring a diverse workforce.  See Exhibit B.

18.     In order to entice Banks to leave his lucrative job in New York, uproot his family, and move to Cleveland, Foundation made several promises to Banks regarding what he could expect from his employment with Foundation.

19.     Foundation agreed to employ Banks as the General Manager and Managing Partner of both Motorcars Honda and Motorcars Toyota.

20.     Foundation agreed to pay Banks a base salary of $10,000, plus a bonus equal to 10% of the net earnings before tax of the Dealerships. Foundation further agreed that Banks would be guaranteed $30,000.00/month minimum total base salary plus net earnings from his start date until six months after the close of Foundation's purchase of Motorcars Honda and Motorcars Toyota.

21.    Foundation also offered Banks the opportunity to purchase to a 25% partnership interest in Foundation.

22.    Foundation also agreed to pay Banks a moving allowance for up to $20,000 for relocation expenses from New York to Cleveland as well living and vehicle allowances.

23.    Foundation, through its officers, Kutschinski and Kramer, also assured Banks that he would have complete autonomy over the management of both Dealerships.

24.    Additionally, Foundation, through its officers, promised that Banks would only be fired if he did anything morally wrong.

25.    Banks was reluctant to leave his current employment and residence in New York. Banks was especially concerned about his future if the purchase of the Dealerships did not go through.  However, Foundation, through its officers, assured him that the deal would "sail through."

26.    Foundation further assured Banks that in the very unlikely event the deal did not go through, he would still have a job with Foundation.

27.    Foundation also told Banks that his employment was not conditioned on upon him investing and that Banks would still be a GM if he decided not to invest as a partner.

28.    These representations, along with the promises that Banks would have full autonomy as GM, that he would be employed with Foundation regardless of the sale of the Dealerships, that his relocation and living expenses would be reimbursed, and that he would not be fired except if he did anything morally wrong, induced him to accept the offer from Foundation.

29.    On or about January 3, 2019, Banks moved to Cleveland.

5

30.     In doing so, Banks spent the money that he and his wife had been saving for IVF treatments with the understanding based on the representations from Foundation that he would be reimbursed for his relocation expenses.

31.     On January 7, 2019, Banks began his employment with Foundation and was jointly employed by Foundation and Motorcars Honda.

32.     Once Banks arrived in Ohio, he was informed by Foundation that he would be managing only Motorcars Honda until Toyota approved the sale of Motorcars Toyota.

33.     Despite the promises made by Foundation regarding Banks' autonomy to make decisions, Banks' ability to manage the dealership was extremely limited.

34.     Once Banks began working at the Motorcars Honda, Foundation required Banks to comply with the directives of Chuck Gile and Trevor Gile, who were very involved in supervising and directing Banks' day to day management of the dealership.

35.     Banks interacted with Chuck Gile weekly via email or phone calls as Chuck Gile was not present at Motorcars Honda, but he communicated his directives to Banks through Kramer and Foundation and required updates on what was happening at the dealership.

36.     Banks interacted with Trevor Gile at Motocars Honda daily, more specifically regarding the operations under the Management Contact between Foundation and Motorcars Honda.

37.     Trevor Gile was to be Banks' supervisor until the dealership purchase of Motorcars Honda closed.

38.     Foundation required Banks to comply with the direction and supervision of Chuck Gile and Trevor Chile until the dealership purchase of Motorcars Honda closed.

39.     Additionally, Foundation required any actions regarding employees to be approved by Kramer first, demonstrating Banks' lack of autonomy and decision-making power at the dealership.

40.     The Giles, Kramer, and Foundation demanded that Banks be present at the dealership from open to close (9:00 AM to 8:00 PM), seven days per week.

41.     Due to the unreasonable expectation of a seventy-seven (77) hour work week, Banks felt compelled to disclose that he had been diagnosed with Multiple Sclerosis ("MS"). Banks stated that the MS did not affect his ability to perform his job as GM.

42.     Banks told Foundation and Motorcars Honda that while he would do his best to work open to close as requested, he did not think this would be efficient or effective. Banks explained that it might not be possible to work such excessive hours given his MS.

43.     Banks also stated that he and his wife had been experiencing fertility problems and were participating in IVF, as well as exploring surrogacy and adoption. Working open to close, seven days per week, would impede Banks' ability to remedy the fertility issue.

44.     Banks requested to work Monday through Friday during the normal working hours of 8:30am to 5:30pm, as well as Saturday from 8:30am to 12:00pm.

45.     Defendants were thus put on notice of facts which triggered their duty to engage in the interactive process with Banks regarding this reasonable accommodation. Foundation and Motorcars Honda made no attempt to engage in any interactive process with Banks regarding reasonable accommodation.

46.     Despite all these issues and constraints, under Banks' management, the performance of Motorcars Honda improved significantly.  In Banks' two (2) months at Motorcars Honda, Per Vehicle Retail ("PVR") improved by 250% (from $800 to $2,000) and gross profit

7

improved by 30%.  In contrast, the Toyota dealership, which Banks was not allowed to manage at this time, decreased in sales.

47.     Discussions regarding Foundation's purchase of both Motorcars Honda and Motorcars Toyota continued to move forward in reliance on Foundation's submissions which held out Banks as taking on a key role after the purchase given his experience and success as a leader in the US auto industry, as well as his status as a minority.

48.     On March 7, 2019, with the deal being on track and shortly after Banks disclosed his MS, Foundation terminated his employment.

49.     Foundation attempted to mask its wrongful termination of Banks under the false pretext that Banks was terminated because he allegedly failed to qualify for financing for investment in the dealership.

50.     Banks never received a refusal from his bank to provide financing for investment in the dealerships.  In contrast, communications from his bank indicated that it was willing to finance Banks' investment in the Dealerships.

51.     Additionally, Foundation had provided Banks with a Non-Disclosure Agreement to provide to his bank to start the financing process indicating that the investment process was moving forward.

52.     Obtaining financing to purchase an ownership interest in the dealership was not a requirement for Banks' continued employment.  In fact, despite repeated requests, Banks never received the partnership agreement that would allow him to invest.

53.     Banks' wrongful termination occurred because Defendants wanted to avoid honoring the promises and agreements had made to him, including but not limited to, giving Banks a 25% ownership interest in the Dealerships, full autonomy over the management of both

8

Dealerships, and other benefits such as vacation pay, insurance, and moving, living and vehicle expenses.

54.     Defendants used Banks' name, credentials, expertise in the US auto industry, and minority status as an African American man in order to promote its business and obtain approval from Honda and Toyota for the purchase of the Dealerships.

55.     Once Defendants obtained the requisite approval and the deal was underway, Defendants terminated Banks.

<u>**COUNT I**</u>
**(Breach of Contract)**

56.     Banks restates and realleges all of his allegations contained in Paragraphs 1 through 55 of his Complaint as if fully rewritten herein.

57.     Banks and Defendants entered into an agreement whereby Banks promised to relocate to Cleveland to work for Foundation and Motorcars Honda.

58.     In consideration for Banks' promises, Foundation and Motorcars Honda promised to compensate Banks for his roles as the General Manager and Managing Partner at both the Toyota and Honda dealerships and to provide Banks with complete autonomy at the Dealerships.

59.     The compensation terms promised by Foundation and agreed to by Banks included a guaranteed salary of $30,000 per month from his start date until six months after the close of the purchase of the Dealerships, as well as benefits, including vacation pay, insurance, moving, living and vehicle allowances.

60.     In reliance on the terms of the compensation and benefits promised by Foundation and on the partnership buy-in, Banks quit his job in New York, spent the money he saved for IVF treatments to relocate to Cleveland, Ohio, and performed his obligations under the agreement by managing the Motorcars Honda dealership and increasing its profitability.

9

61.     Defendants breached the contract by:

a.   failing to allow Banks to purchase a 25% partnership interest;

b.   failing to compensate Banks per the agreed upon terms;

c.   failing to reimburse Banks for any moving expenses; and

d.   terminating Banks' employment with Foundation without just cause and for no legitimate reason.

62.     As a result of Defendants' breaches of contract, Banks has suffered, and continues to suffer, damages, including but not limited to, past and future lost wages, bonuses, deferred compensation and other benefits, Twenty Thousand Dollars ($20,000.00) for moving expenses, and Twenty-Five Percent (25%) partnership interest in Foundation after the sale of the Dealerships closed, plus expenses incurred in attempting to obtain the benefits due to Banks, and expenses incurred in seeking and obtaining substitute employment, all to Banks' damage in an amount to be proven at trial, but in excess of Twenty-Five Thousand Dollars ($25,000.00).

## COUNT II
### (Promissory Estoppel)

63.     Banks restates and realleges all of his allegations contained in Paragraphs 1 through 62 of his Complaint as if fully rewritten herein.

64.     Defendants clearly and unambiguously promised that Banks would have complete autonomy over the Dealerships if he relocated from New York to Cleveland to accept the position as General Manager and Manager partner of the Dealerships.

65.     Defendants clearly and unambiguously promised Banks that he would have a 25% ownership interest in and management of the Dealerships after the deal closed.

66.     Defendants cleary and unambiguously promised Banks that even if the deal was not completed, he would still remain employed by Foundation.

67.     In reliance on these promises, Banks left his stable job in New York where he was making $22,500/month and moved to Cleveland, Ohio to work for Foundation.

68.     Banks' reliance on Defendants' promises was reasonable and foreseeable as Banks expressed concerns and hesitation about making the move, but was repeatedly reassured that the conditions of his employment would be met and the deal would be completed such that he would be running the Dealerships with complete autonomy beginning in January 2019.

69.     As a result of Defendants' breach of these promises, Banks was injured and sustained damages, including but not limited to, lost wages and benefits, future wages and benefits, and emotional distress in an amount to be proven at trial, but in excess of Twenty-Five Thousand Dollars ($25,000.00).

## COUNT III
### (Unjust Enrichment)

70.     Banks restates and realleges all of his allegations contained in Paragraphs 1 through 69 of his Complaint as if fully rewritten herein.

71.     Banks conferred a benefit on Defendants through the use of his name, credentials, expertise in the US auto industry, and minority status as an African American man in order for Defendants to promote their business and obtain approval from Honda and Toyota for the purchase of the Dealerships.

72.     Defendants had knowledge of this benefit as they presented Banks as a "strong Dealer Principal," touting his "10+ years of industry experience" making him "an expert in Automotive Operations and Process Development."  See Exhibit B, pg. 4.

73.     Foundation's submission to Honda profiled Banks as "highly regarded" and included testimonials from several of his previous colleagues regarding Banks' leadership, positive attitude and enthusiasm. See Exhibit B, pg. 5.

74.     Foundation promoted Banks' expertise and experience as part of the Management Team that would lead the Honda dealership after the sale even though Banks had not yet accepted employment or begun working for Foundation at that time.  See Exhibit B.

75.     Banks is a young and successful African American man, and Foundation exploited his minority status to their benefit to garner favor with Honda who, like other companies, sought out the economic and reputational benefits from hiring a diverse workforce.  See Exhibit B.

76.     Defendants retained the benefit conferred by Banks by obtaining approval to purchase the Honda dealership and moving forward with the deal, but then terminated Banks to avoid having to honor any agreements and promises they made to him, including but not limited to the 25% ownership interest in the Dealerships and other compensation and benefits.

77.     It would be unjust for Defendants to retain this benefit without providing Banks the value of the services rendered and promises made to him.

78.     As a result of Defendants' unjust enrichment, Banks was injured and sustained damages, including but not limited to, lost wages and benefits, future wages and benefits, and emotional distress in an amount to be proven at trial, but in excess of Twenty-Five Thousand Dollars ($25,000.00).

**COUNT IV**
**(Violation of Ohio Rev. Code § 4112.02)**

79.     Banks restates and realleges all of his allegations contained in Paragraphs 1 through 78 of his Complaint as if fully rewritten herein.

80.     Foundation is an "employer" as defined by R.C. 4112.01(A)(2).

81.     Banks was jointly employed by Foundation and Motorcars Honda while working as General Manager for Motorcars Honda.

82.     Banks suffers from Multiple Sclerosis, and he and his wife were and are experiencing fertility problems and, as a result of his disability, Banks is a member of a protected class pursuant to R.C. § 4112.

83.     At all times relevant, Banks was qualified to perform the essential functions of his position as General Manager of the dealership, with or without reasonable accommodation.

84.     Ohio Rev. Code § 4112.02(A) prohibits employers from discriminating on the basis of disability "with respect to hire, tenure, terms, conditions, or privileged of employment or any matter directly or indirectly related to employment."

85.     Defendants have violated Ohio Rev. Code § 4112.02(A) by denying Banks' requests for reasonable accommodations, failing to engage in the interactive process regarding reasonable accommodation of Banks' disabilities, and terminating Banks' employment with Foundation.

86.     Defendants' conduct has adversely affected Banks as Defendants terminated Banks' employment without valid justification.

87.     As a result of Defendants' actions, Banks has suffered, and continues to suffer, damages including past and future lost wages, bonuses, deferred compensation and other benefits, Twenty Thousand Dollars ($20,000.00) for moving expenses, and Twenty-Five Percent (25%) partnership interest in Foundation after the sale of the Dealerships closed, emotional distress, plus expenses incurred in attempting to obtain the benefits due to Banks, and expenses incurred in seeking and obtaining substitute employment, all to Banks' damage in an amount to be proven at trial, but in excess of Twenty-Five Thousand Dollars ($25,000.00).

88.     Because Defendants are part of a single, integrated enterprise and/or are joint employers, Defendants are jointly and severally liable for Banks' compensatory damages. Because

13

they acted with actual malice on account of their conscious disregard for Banks' rights under Ohio law, they are also liable for punitive damages.

89.     Finally, Defendants are liable for court costs, reasonable attorneys' fees and expenses Banks has incurred in the prosecution of this matter.

## COUNT V
### (Retaliation)

90.     Banks restates and realleges all of his allegations contained in Paragraphs 1 through 89 of his Complaint as if fully rewritten herein.

91.     Ohio Rev. Code § 4112.02(I) prohibits employers from discriminating "against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted or participated in any matter in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code."

92.     Defendants violated Ohio Rev. Code § 4112.02(I) when they retaliated against Banks when he requested a reasonable accommodation for his disability.

93.     Banks engaged in a protected activity by requesting a reasonable accommodation to work Monday through Friday during the normal working hours of 8:30am to 5:30pm, as well as Saturday from 8:30am to 12:00pm.

94.     Banks' protected activity was known to Defendants as he spoke with both Kutschinski and Kramer about his requested working hours.

95.     Chuck Gile and Trevor Gile instructed Foundation to impose longer working hours for Banks without reasonable accommodation.

96.     Defendants took an adverse action against Banks by terminating his employment.

14

97.     Additionally, Defendants failed to engage in an interactive process to provide reasonable accommodation as to Banks' working hours.

98.     A causal connection exists between Banks' protected activity of requesting a reasonable accommodation for his disability and Defendants' termination of his employment.

99.     As a result of Defendants' actions, Banks has suffered, and continues to suffer, damages including past and future lost wages, bonuses, deferred compensation and other benefits, Twenty Thousand Dollars ($20,000.00) for moving expenses, and Twenty-Five Percent (25%) partnership interest in Foundation after the sale of the Dealerships closed, emotional distress, plus expenses incurred in attempting to obtain the benefits due to Banks, and expenses incurred in seeking and obtaining substitute employment, all to Banks' damage in an amount to be proven at trial, but in excess of Twenty-Five Thousand Dollars ($25,000.00), in addition to punitive damages.

## COUNT VI
**(Violation of ORC §4112.02(J) Against Kutschinski, Kramer, Chuck Gile, and Trevor Gile)**

100.    Banks restates and realleges all of his allegations contained in Paragraphs 1 through 99 of his Complaint as if fully rewritten herein.

101.    Ohio Revised Code § 4112.02(J) states that it shall be an unlawful discriminatory practice "[f]or any person to aid, abet, incite, compel, or coerce the doing of any act declared by this section to be an unlawful discriminatory practice, to obstruct or prevent any person from complying with this chapter or any order issued under it, or to attempt directly or indirectly to commit any act declared by this section to be an unlawful discriminatory practice."

102.    Kutschinski, Kramer, Chuck Gile, and Trevor Gile aided and abetted Foundation and Motorcars Honda in their discriminatory treatment of Banks.

15

103.    Kutschinski, Kramer, Chuck Gile, and Trevor Gile knew of Banks' disabilities and his requests for reasonable accommodation to work standard hours at the dealership as he had successfully done in his prior jobs.

104.    Chuck Gile and Trevor Gile instructed Foundation to impose longer working hours for Banks without reasonable accommodation and without engaging in the interactive process in violation of ORC § 4112.02(J).

105.    Shortly thereafter, Kutschinski and Kramer personally participated in, coerced and compelled Banks' termination in violation of ORC § 4112.02(J).

106.    As a result of Defendants' actions, Banks has suffered, and continues to suffer, damages including past and future lost wages, bonuses, deferred compensation and other benefits, Twenty Thousand Dollars ($20,000.00) for moving expenses, and Twenty-Five Percent (25%) partnership interest in Foundation after the sale of the Dealerships closed, emotional distress, plus expenses incurred in attempting to obtain the benefits due to Banks, and expenses incurred in seeking and obtaining substitute employment, all to Banks' damage in an amount to be proven at trial, but in excess of Twenty-Five Thousand Dollars ($25,000.00), in addition to punitive damages.

## COUNT VII
### (Fraud)

107.    Banks restates and realleges all of his allegations contained in Paragraphs 1 through 106 of his Complaint as if fully rewritten herein.

108.    Defendants, in order to entice Banks to leave his job in New York and relocate to Cleveland, represented to Banks that he would be employed as General Manager of Motorcars Honda regardless of whether the purchase of both Dealerships closed.

16

109.    Defendants also represented to Banks that he would have the opportunity to buy a 25% interest in the partnership after the Dealerships purchase closed.

110.    Defendants represented to Banks that he would be reimbursed for his moving and living expenses in the amount of $20,000 once he relocated to Cleveland.

111.    Defendants also represented that Foundation was an Equal Opportunity Employer and that it complies with all applicable employment laws.

112.    These representations were material to Banks' decision to relocate to Cleveland and begin working with Defendants.

113.    However, Defendants needed Banks' name, credentials, expertise in the US auto industry, and minority status as an African American man in order to promote its business and obtain approval from Honda and Toyota for the purchase of the Dealerships.

114.    Thus, these representations were made falsely, with knowledge of their falsity, or with such utter disregard and recklessness as to whether they were true or false that knowledge may be inferred, solely to entice Banks to become involved with Defendant in order to for the purchase of the Dealerships to progress.

115.    Defendants intended to, and did, mislead Banks into relying on these representations and to accept the General Manager position with Foundation and move to Cleveland to begin his employment.

116.    Banks justifiably relied on these representations as he was repeatedly assured by Foundation, through its officers Kutschinski and Kramer, that he would remain employed as a General Manager even if the purchase of the Dealerships did not close and that his ability to buy a 25% partnership interest was not required for his continued employment.

Electronically Filed 07/22/2020 09:33 / / CV 20 935081 / Confirmation Nbr. 2035672 / CLSLP

117.     Defendants used Banks' name, credentials, expertise in the US auto industry, and minority status as an African American man in order to promote its business and obtain approval from Honda and Toyota for the purchase of the Dealerships.

118.     Once Defendants obtained approval and the deal was underway, Defendants discarded Banks.

119.     As a result of Defendants' fraudulent representations to Banks and Banks' justifiable reliance thereon, Banks has suffered, and continues to suffer, damages including past and future lost wages, bonuses, deferred compensation and other benefits, Twenty Thousand Dollars ($20,000.00) for moving expenses, and Twenty-Five Percent (25%) partnership interest in Foundation after the sale of the Dealerships closed, emotional distress, plus expenses incurred in attempting to obtain the benefits due to Banks, and expenses incurred in seeking and obtaining substitute employment, all to Banks' damage in an amount to be proven at trial, but in excess of Twenty-Five Thousand Dollars ($25,000.00), in addition to punitive damages.

WHEREFORE, Plaintiff, Kenneth Banks, demands judgment in his favor as follows:

A.     Under Count One, an award for damages including but not limited to, past and future lost wages, bonuses, deferred compensation and other benefits, Twenty Thousand Dollars ($20,000.00) for moving expenses, and Twenty-Five Percent (25%) partnership interest in Foundation after the sale of the Dealerships closed, plus expenses incurred in attempting to obtain the benefits due to Banks, and expenses incurred in seeking and obtaining substitute employment, all to Banks' damage in an amount to be proven at trial, but in excess of Twenty-Five Thousand Dollars ($25,000.00);

B.     Under Court Two, an award for damages including but not limited to, past and future lost wages, bonuses, deferred compensation and other benefits, Twenty Thousand Dollars

($20,000.00) for moving expenses, and Twenty-Five Percent (25%) partnership interest in Foundation after the sale of the Dealerships closed, emotional distress, including emotional distress due to the loss of ability to pay for IVF treatments, plus expenses incurred in attempting to obtain the benefits due to Banks, and expenses incurred in seeking and obtaining substitute employment, all to Banks' damage in an amount to be proven at trial, but in excess of Twenty-Five Thousand Dollars ($25,000.00);

C.      Under Count Three, an award for damages, including but not limited to, past and future lost wages, bonuses, deferred compensation and other benefits, Twenty Thousand Dollars ($20,000.00) for moving expenses, and Twenty-Five Percent (25%) partnership interest in Foundation after the sale of the Dealerships closed, emotional distress, including emotional distress due to the loss of ability to pay for IVF treatments, plus expenses incurred in attempting to obtain the benefits due to Banks, and expenses incurred in seeking and obtaining substitute employment, all to Banks' damage in an amount to be proven at trial, but in excess of Twenty-Five Thousand Dollars ($25,000.00);

D.      Under Count Four, an award for damages, including but not limited to, past and future lost wages, bonuses, deferred compensation and other benefits, Twenty Thousand Dollars ($20,000.00) for moving expenses, and Twenty-Five Percent (25%) partnership interest in Foundation after the sale of the Dealerships closed, emotional distress, including emotional distress due to the loss of ability to pay for IVF treatments, plus expenses incurred in attempting to obtain the benefits due to Banks, and expenses incurred in seeking and obtaining substitute employment, all to Banks' damage in an amount to be proven at trial, but in excess of Twenty-Five Thousand Dollars ($25,000.00), in addition to punitive damages;

19

E.      Under Count Five, an award for damages, including but not limited to, past and future lost wages, bonuses, deferred compensation and other benefits, Twenty Thousand Dollars ($20,000.00) for moving expenses, and Twenty-Five Percent (25%) partnership interest in Foundation after the sale of the Dealerships closed, emotional distress, including emotional distress due to the loss of ability to pay for IVF treatments, plus expenses incurred in attempting to obtain the benefits due to Banks, and expenses incurred in seeking and obtaining substitute employment, all to Banks' damage in an amount to be proven at trial, but in excess of Twenty-Five Thousand Dollars ($25,000.00), in addition to punitive damages;

F.  Under Count Six, an award for damages, including but not limited to, past and future lost wages, bonuses, deferred compensation and other benefits, Twenty Thousand Dollars ($20,000.00) for moving expenses, and Twenty-Five Percent (25%) partnership interest in Foundation after the sale of the Dealerships closed, emotional distress, including emotional distress due to the loss of ability to pay for IVF treatments, plus expenses incurred in attempting to obtain the benefits due to Banks, and expenses incurred in seeking and obtaining substitute employment, all to Banks' damage in an amount to be proven at trial, but in excess of Twenty-Five Thousand Dollars ($25,000.00), in addition to punitive damages; and

G.  Under Count Seven, an award for damages, including but not limited to, past and future lost wages, bonuses, deferred compensation and other benefits, Twenty Thousand Dollars ($20,000.00) for moving expenses, and Twenty-Five Percent (25%) partnership interest in Foundation after the sale of the Dealerships closed, emotional distress, including emotional distress due to the loss of ability to pay for IVF treatments, plus expenses incurred in attempting to obtain the benefits due to Banks, and expenses incurred in seeking and obtaining substitute

employment, all to Banks' damage in an amount to be proven at trial, but in excess of Twenty-Five Thousand Dollars ($25,000.00); and

H.      Reasonable attorneys' fees, interest, costs, and any other relief which this Court deems appropriate.

Respectfully submitted,

DINN, HOCHMAN & POTTER, LLC:


/s/ Thomas A. Barni
THOMAS A. BARNI (0064555)
BENJAMIN D. CARNAHAN (0079737)
LINDSEY P. ROZEK (0097124)
5910 Landerbrook Drive, Suite 200
Cleveland, Ohio  44124
(440) 446-1100 – Phone
(440) 446-1240 – Fax
tbarni@dhplaw.com
bcarnahan@dhplaw.com
lrozek@dhplaw.com
Attorneys for Plaintiff


## JURY DEMAND

Plaintiff, **KENNETH BANKS,** hereby demands a trial by jury pursuant to the Ohio Rules of Civil Procedure.

/s/ Thomas A. Barni
THOMAS A. BARNI (0064555)
BENJAMIN D. CARNAHAN (0079737)
LINDSEY P. ROZEK (0097124)
Attorneys for Plaintiff

21

EXHIBIT A



## FORTY UNDER 40







**ALL    <PREV    NEXT>**

# Ken Banks, 35

*Director of variable operations,* Mike Shaw Automotive

**🐦 TWEET**    **f SHARE**    **MORE ⌄**

**Achievement: Set sales records at two dealerships before becoming director of variable operations for Mike Shaw Automotive Group**

Ken Banks counts three highly influential people in his life: a cousin, a colleague and a homeless man.

Before Banks, 35, became the director of variable operations for Denver's Mike Shaw

Automotive, which includes four stores in Texas, he grew up poor. He was the son of a crack-addicted father and an alcoholic mother.

"My dad went on a crack bender when I was 8 and left me alone for four days. I ate lemon meringue pie to survive," Banks said. "Before age 11, I'd sold crack, broken into cars and seen people get shot. My brother went to prison when I was 11, and he was my role model at that point."

But his 14-year-old cousin asked Banks, then 11, "What are you doing with your life?"

"He wasn't talking about drugs or gangs like I was used to hearing about, so I didn't know how to answer him," Banks said.

That cousin became a role model. "He turned it for me by saying, 'Hey, man, you have to go to school.'"

Banks dropped the gang he had started and focused on school. He graduated and, in 1999, joined the Army Reserve. A year later, while on leave, he was sitting on a bus bench in Houston when a new Lincoln Navigator SUV pulled up.

"I was drooling. I'd never seen anything like it," Banks said. "The homeless man sitting beside me, he is the most influential man in my life to this date because he said, 'If you work for a car dealership, they give you that to drive.'"

Banks spent the next few hours walking to about a dozen dealerships applying for jobs. They all said no. Finally, Fred Haas Toyota World accepted him into a new-car sales training program. He started selling new cars there in 2000, he said.

Over the next seven years, he sold cars and was promoted to finance jobs at various dealerships. In 2007, he joined Lexus of Clear Lake, a Group 1 Automotive Inc. store. There, he said, he met his mentor. Joey Dupuis molded him into a manager and brought Banks over to Group 1's Sterling McCall Lexus store, where Banks set records in sales and finance and insurance, he said.

At Sterling McCall Lexus, he led an effort that "smashed" a new-car sales record.

"I get emotional about it because it was the first time where I made a plan, we executed it,

and we did it," Banks said. "That's the most proud of myself that I had ever been."

By age 31, he was general manager of Group 1's Nissan of Mobile (Ala.), where he met dealer Mike Shaw. Shaw was applying for a new Lexus point near that market and wanted Banks to run it. Lexus did not award Shaw the point, but Shaw hired Banks.

"I was so impressed," Shaw said. "He's one of the best process guys I've ever seen. His attitude, enthusiasm and energy reminds me of myself at his age. He just gets it done."

Banks said his rough start in life helps him work well with people because he gives others a chance.

His success enables him to positively influence and financially support his family, too. He helped his older brother start a business upon his release from prison and funded his younger brother's college education, despite never completing college himself, he said.

"All these people who were poor with me, I have been able to provide for them," said Banks. "My brother's kids won't have to survive on lemon meringue pie."

📄 REPRINTS

## GET FREE NEWSLETTERS

Sign up and get the best of Automotive News delivered straight to your email inbox, free of charge. Choose your news – we will deliver.

Email Address

CHOOSE NEWSLETTERS

## SUBSCRIBE TODAY

Get 24/7 access to in-depth, authoritative coverage of the auto industry from a global team of reporters and editors covering the news that's vital to your business.



## CONNECT WITH US

   

Our mission

*The Automotive News mission is to be the primary source of industry news, data and understanding for the industry's decision-makers interested in North America.*

# Automotive News

## CONTACT US

1155 Gratiot Avenue
Detroit, Michigan
48207-2997

(877) 812-1584

Email us

**Automotive News**
ISSN 0005-1551 (print)
ISSN 1557-7686 (online)

**Fixed Ops Journal**
ISSN 2576-1064 (print)

ISSN 2576-1072 (online)

## RESOURCES

About us                                            Manage your account

Contact Us                                          Reprints

Media Kit                                           Ad Choices ▷

Subscribe                                           Sitemap

**LEGAL**

Terms and Conditions

Privacy Policy

Privacy Request



Copyright © 1996-2020. Crain Communications, Inc. All Rights Reserved.

Electronically Filed 07/22/2020 09:33 /  / CV 20 935081 / Confirmation Nbr. 2035672 / CLSLP

EXHIBIT B



# SUBMISSION TO HONDA MOTOR COMPANY
# FOR THE MOTORCARS HONDA BUY/SELL

PREPARED BY FOUNDATION AUTOMOTIVE CORP.

2018-12-18

Electronically Filed 07/22/2020 09:33 / CV 20 935081 / Confirmation Nbr. 2036672 / CLSLP

**ATTENTION:**

## GARY RUSSO

Zone Manager, Sales

Honda Motor Company

## BOB RINGO

Assistant Zone Manager, Market Rep Dept.

Honda Motor Company

Dear Gary Russo and Bob Ringo,

Foundation Automotive is requesting your approval of our purchase of Motorcars Honda. We have a deep passion for the brand, and a clear understanding of the requirements you place on your Retailer. Our group has a strong position to represent you well; and, we will demonstrate this on the following pages.

The entrepreneurial history of our company has depth in multiple industries. Our history began with a single dealership in British Columbia, Canada. Our business model is rooted in this history, and our approach empowers dealership management with strong local market passion. We believe in digging deeply into the very fibre of the community it serves. Additionally, our business model provides experienced General Managers with the resources they need to develop fertile ground.

We present a strong Dealer Principal on the pages that follow. We know the candidate well, and he possesses the required skill set and dedication to have measurable success in this dealership. The candidate has the ability to harness all available market share, while being laser-focused on excellence. He has shown great leadership, and will leave an indelible mark on the community he proudly serves.

By approving us for this purchase, we guarantee that you will have our focus and our expertise. We promise to dedicate all of the resources required to live up to both our high  standards, and the performance expectations of Honda Motor Company. We are committed to reinvest capital in facility enhancements, people development and inventory expansion. We  also come equipped with steady capital and the strategic and operational support required  to optimize processes and efficiencies, where required.

I am 100% focused on building Foundation Automotive Corp. and the excellent brands we represent. My team and I are committed to a seamless transition, and are dedicated to growing Motorcars Honda market share in Cleveland Heights, Ohio.

Thank you for your consideration. We look forward to sharing our passion in person.

Yours truly,

**Kevin Kutschinski**
President & CEO
Foundation Automotive Corp.



THE
IDEAL CANDIDATE

Electronically Filed 07/22/2019 13:45 / / CV 19 915953 / Confirmation Nbr. 1805571 / CLDLJ

# KENNETH **BANKS**
## DEALER PRINCIPAL

With 10+ years of industry experience, varying from Sales Director to General Manager, Mr. Kenneth Banks is our nomination as the new Dealer Principal of Foundation Honda Cleveland.

As the current General Manager of Levittown Ford, Ken is the correct choice to lead the dealership. Through his vision and leadership, he successfully turned Levittown into the number one Ford store in Long Island, in the first month. Dealerships lead by Ken utilize his forward-thinking process development to achieve success. Ken is an award-winning trailblazer, being the recipient of the Automotive News 40 under 40 Award in 2017.

Ken's many years of experience have made him an expert in Automotive Operations and Process Development, which have excelled his dealerships to record setting profits. Ken contributes insightful, change-driven decision-making strategies to rise above challenges and attain profitable outcomes.  Success, to Ken, is when he is able to create an environment where process development is used to create an experience for the customer in which the process of buying a car is fun. Ken leads his team to the top by example, with ethics and integrity.

In addition to being passionate about the automotive business, Ken has a passion for being a part of the communities he lives in. Ken regularly speaks to underprivileged youth, and 10 years ago Ken started a fundraiser called "Do Something Bigger" that collects donations for local charities.

Ken will carry your enterprise flag with respect, pride, and a strong passion for achieving superior results in a very competitive environment.



" **THE GREATNESS OF A COMMUNITY IS MOST ACCURATELY MEASURED BY THE COMPASSIONATE ACTIONS OF ITS MEMBERS."**

**– CORETTA SCOTT KING**

# KENNETH BANKS
## HIGHLY REGARDED

"Ken Banks is a dynamic leader that developed processes that drove sales. It was a pleasure when I had the opportunity to visit his store. He made a real difference and impacted sales"

-Paula Wells, Nissan North American

"I was so impressed, he is one of the best process guys I've ever seen. His attitude, enthusiasm, and energy remind me of myself at his age, he just gets it done."

-Mike Shaw, Time Dealer of the Year

"Ken Banks was a pleasure to partner with at Sterling McCall Lexus. He always had an optimistic view of the opportunity and whenever I layed his sales goal out he replied each time "Lay-up". I would recommend Ken for any leadership opportunity. He is a highly energetic go getter"

-Robert Bolden, Lexus Southern Area





THE
# PERFECT PARTNER

"GROWTH IS NEVER BY MERE CHANCE;
IT IS THE RESULT OF FORCES
WORKING TOGETHER."

– JAMES CASH PENNEY

Electronically Filed 07/22/2020 09:33 / / CV 20 935081 / Confirmation Nbr. 2035672 / CLSLP

IN SELECTING FOUNDATION AUTOMOTIVE, YOU
GAIN A  VERY PASSIONATE PARTNER WHO RELISHES
THE PRODUCT EXPERIENCE AND MAKES IT THE
CENTERPIECE OF THE DEALERSHIP.

**Embodied by a decentralized business model, Foundation Automotive brings the following, as part of our standard equipment:**

**1** The independent authority to enable our Managing Partner to lead their respective teams and generate close community relationships, while delivering on all OEM objectives.

**2** Strategic operational support focused on process improvement and efficiency.

**3** Support for our dealership through reduced administrative time spent dealing with issues that take our Dealer Principal away from market share gains; and, our commitment to always deliver the very best guest experience.

**4** The resources necessary to support not only OEM standards, but also the expectations of our guests. We commit to always invest in our store to capitalize on growth and customer satisfaction opportunities.

**5** Recruiting of best-in-class talent. We will spare no expense to invest, train and mentor those that work for us.

**6** Rigour in our approach to create, track and execute operational and marketing-focused plans to deliver best-in-class sales and service experiences.

**7** A commitment to align with, and support, the Honda brand we proudly represent.

Electronically Filed 08/12/2020 09:03 / / Confirmation Nbr. 2036672 / CLSLP

## FOUNDATION AUTOMOTIVE CORP.

LEAD BY KEVIN KUTSCHINSKI AS
PRESIDENT & CEO, THE MANAGEMENT
TEAM OF FOUNDATION AUTOMOTIVE
INCLUDES A STRATEGIC MIX OF
EXPERIENCED DEALERSHIP OPERATIONS
SPECIALISTS, COMPLEMENTED BY A
TEAM OF ANALYTICAL PROFESSIONALS.

**KEVIN KUTSCHINSKI**
PRESIDENT & CEO
FOUNDATION AUTOMOTIVE CORP.

**CHUCK KRAMER**
COO

**KENNETH BANKS**
DEALER PRINCIPAL
FOUNDATION HONDA CLEVELAND

**DEREK SLEMKO**
CFO

**MIKE MCMEEKEN**
VICE PRESIDENT, FINANCE

**SAMANTHA WRIGHT**
ANALYST

Electronically Filed 07/22/2020 09:33 / / CV 20 935081 / Confirmation Nbr. 2036672 / CLSLP



KEVIN **KUTSCHINSKI**

PRESIDENT & CEO

Kevin's passion for the automotive industry started with ownership of a series of successful dealerships, including his first General Motors dealership in Northern British Columbia. Kevin learned the importance of being community-focused to enable his dealership's success in communities like Cleveland Heights.

Kevin's sharp business acumen means he recognizes the impact each detail has on a business' success. From a small line item sale or a simple repair, to multiple vehicle purchases, each component plays a vital role in the larger picture. Kevin empowers every department to make immediate, thoughtful improvements through meticulous daily analysis of each of these customer touch-points. His quick and detailed response is the cornerstone to operating the business, and the reason customers continued to return. As a result, Kevin's General Motors store in Dawson Creek, Canada earned a place as the number one dealer, in the number one Dealership Performance 20 Group in North America, with Performance Incorporated.

Kevin is a successful entrepreneur – with expertise in investment banking, oil and gas, and property development. To this day, he is committed to the same approach he perfected in Dawson Creek – to be community-focused; and, through daily analysis and refined sales processes, deliver best-in-class customer experiences.

Electronically Filed 07/22/2020 09:33 / / CV 20 935081 / Confirmation Nbr. 2035672 / CLSLP

## CHUCK **KRAMER**
### COO

As COO for the company, Chuck brings 30+ years of experience providing strategic leadership to a variety of manufacturer dealerships in the Houston, Texas area. Chuck's passion for the industry runs deep, carrying a wealth of experience gained by working with an array of OEM's including Ford, GMC, Chevrolet, Cadillac, FCA, Subaru, Hyundai, Mazda, Kia and Mitsubishi.

Chuck has an excellent reputation for both long and short term turnaround success. As the Managing Partner at Planet Ford Chuck led the dealership from -$1.7MM of profit in 2007, to earning $8.9M profit in 2016. He won more customer service awards than any Ford dealership in the USA from 2012 to 2017. Chuck elevated the dealerships national ranking to Top 50 in 2016, up from 150th in 2008, and ranked #1 in the entire Central Market by Service Customers in 2014. As the General Manager at 5 Star Ford he doubled profit in one month's time by implementing sales and customer service procedural improvements, and increased sales and CSI by 10 points in 45 days by adding proper processes & procedures.

## DEREK **SLEMKO**
### CFO

As CFO (CA) for the company, Derek brings an impressive track record offering 18-years experience in various finance and executive level roles. He is a capable decision maker with management experience, practical technical knowledge, and skills across all functions of finance, valuation and accounting.

He has a proven track record of executing multiple public and private equity and debt financing transactions. Derek has sourced, negotiated, structured and executed multiple acquisitions and mergers, ranging in size from $4 million to nearly $400 million. He has managed operations, overseeing 58 employees and over 50 investments funds, as COO of a publicly traded investment fund manager. Derek has also experience operating within multiple regulatory frameworks such as the TSX, the OSC, IIROC and CRA.

## MIKE **MCMEEKEN**
### VICE PRESIDENT, FINANCE

As Vice President Finance for Foundation Automotive Corp., Mike's roles involve sourcing, analyzing, evaluating, and negotiating dealership acquisitions, along with improving operations of owned dealerships through the use of data analytics.

Prior to being a founding member of Foundation Auto, Mike spent five years in an equity analyst role covering Small Cap and Junior Oil & Gas industries, for a boutique investment bank in Calgary. This role provided Mike a wealth of experience and knowledge in business valuation and analytics, and is the cornerstone for principals used in seeking out and acquiring profitable dealerships with measurable upside opportunities.

## SAMANTHA **WRIGHT**
### ANALYST

With a passion for numbers that grew from earning her Bachelor of Business Administration focused in Financial Analysis at Mount Royal University, Samantha is an Analyst at Foundation Automotive; and, is currently pursuing her designation as a CFA Level II candidate.

# KEVIN KUTSCHINSKI
## WELL REGARDED IN THE COMMUNITY

Electronically Filed 07/20/2020 09:33 / / CV 20 935081 / Confirmation Nbr. 2036672 / CLSLP

**City of Dawson Creek**
Box 150, Dawson Creek, BC  V1G 4G4

**Office of the Mayor**
Tel:  (250) 784-3616
Fax:  (250) 782-3203

February 6, 2018

Attn: Kevin Kutschinski

Dear Kevin:

It is so good to hear from you and I am pleased to offer this letter of introduction for your use.

I have known Kevin for 15-20 years as a local businessperson in Dawson Creek through the various businesses owned and operated by Kevin. I primarily dealt with Kevin through his ownership of Browns Chevrolet in Dawson Creek. Kevin was extremely well known and respected in our community and was active in building the reputation of Browns as a local business that cared about our community. Browns Chevrolet were always involved in those initiatives that helped build and supported sports, entertainment, arts and culture which enhanced the overall quality of life for our residents. Browns demonstrated this in supporting all of the initiatives that helped those organizations that were involved as charities and supporting public good.

I was impressed by Kevin's ongoing commitment and willingness to step up and provide that much needed support, with either financial or resources for the betterment of the community. One of the lasting legacies that Kevin provided was through the effective succession of senior people within his dealership that allowed for a seamless and positive transition to the new ownership of Browns Chevrolet. Browns has continued to demonstrate that strong support to community that helps us all succeed in building a community with a strong quality of life which I feel is a direct result of Kevin's vision and leadership.

I want to wish you the very best and hope our paths cross again in the near future.

Sincerely,

Dale Bumstead
Mayor

"Excellence in Service and Leadership"
www.dawsoncreek.ca

---

November 21, 2017

To: Whom it may concern

Subject: Kevin Kutschinski

Kevin Kutschinski's progression comes as no surprise.  It has been a source of joy observing Kevin's advancement since I met him 25 years ago when he was a young general manager at a dealership ...the youngest I had ever met that wasn't one of the owner's children.

Within three years Kevin had led his team to build and relocate into a cutting-edge facility, (the first of its kind in the country), increased sales volume and significantly enhanced profits.  It was a wonder seeing such a young man with the maturity, confidence and judgement to accomplish what many older, more experienced men often struggled with.

Kevin has continued to succeed throughout his career by anticipating changes in the business climate and acting quickly to capitalize upon profitable opportunities both inside and outside of the automotive industry.  He has an ability to bring together and motivate the right people in his ventures.  Rare among Kevin's peers is his approachability; he is generous with his time and willing to be helpful to others even when there is not a direct benefit to himself.

Marc Rosario Rachiele
Former Manager, General Motors of Canada Ltd. & GM Overseas Development Corporation - Europe (Retired)

# KEVIN KUTSCHINSKI
## WELL REGARDED IN THE COMMUNITY

Electronically Filed 20200909 / / / / / / / / / / / / / / FoundationAuto

**From:** "Blair Lekstrom"
**Subject: from Blair**
**Date:** February 6, 2018 at 9:39:29 AM MST
**To:** <kevink@foundationauto.com>

To whom it may concern,

I have had the privilege of knowing and working with Mr. Kutschinski for over 20 years and have not only enjoyed the opportunity, but also learned a great deal about Kevin. He is a very committed businessman and assures that every dealing he has with an individual or a corporation is dealt with in a manner that exemplifies the highest of professional standards. Kevin was not only a respected businessman in Dawson Creek but was also recognized for his commitment and involvement in the community.

I personally have had the honour of serving British Columbia as an elected Member of the Legislative Assembly and during that time I served as Minister of Community Development, Minister  of Energy Mines and Petroleum Resources and Minister of Transportation and  Infrastructure. During my tenure as an elected official there were many times that I had the opportunity to discuss provincial issues with Mr. Kutschinski and he was an individual who always engaged in the topic at hand and offered his productive thoughts.

I am proud to be able to provide this letter recognizing Kevin for his strong reputation as a man who pursues life with the greatest of professionalism and high integrity. Please feel free to contact me at 250-784-5022 if I can be of any further assistance.

Yours Truly,

**Blair Lekstrom**



WE UNDERSTAND
# THE MARKET

Electronically Filed 07/22/2020 09:49 / CNS- 20 955072 / Confirmation Nbr. 2035672 / CLJCP

OPPORTUNITY #1:
# INVENTORY MANAGEMENT

Having the most optimal inventory on the lot attracts increased traffic and will improve new retail sales potential. As a result of increased sales, trade-in volumes should increase commensurately, coupled with our successful pre-owned retailing process will lead to improved certified used vehicle sales and OEM parts sales (to recondition trade-ins). Not only will sales increase, but in conjunction with a well managed days inventory on hand analysis by model and equipment, interest cost savings will become prominent and allow us to appropriately reinvest positive earnings.

OPPORTUNITY #2:
# WARRANTY PARTS

The Honda dealership has implemented a new warranty parts platform, that organizes a stream-lined warranty parts system to reduce over purchasing and improves timeliness of repairs. To date, this system has been successful but has not achieved its full potential within the dealership (implemented in early 2018). We estimate that this new platform could generate further savings of over $200,000 per year in gross profit once fully implemented.

OPPORTUNITY #3:
# SERVICE DEPARTMENT

The Honda dealership recently finished its express service assembly line, which has the potential to put through 60,000 express services per year (includes: oil change, tire inspection, 50-point inspection). It is only currently processing ~10,000 per year (annualized), implying significant upside once the process gets fully optimized.

Longer term, the Service department will benefit from the proposed changes that will be undertaken at the dealership (e.g. increased advertising, expanded inventory levels, increased new & used sales volumes), which will inevitably increase the number of repair orders coming through the department.

WE KNOW THIS MARKET WELL, AND IN STUDYING THE FINANCIALS, WE SEE OPPORTUNITIES FOR GROWTH.



Electronically Filed 07/22/2020 09:33 / / CV 20 935481 / Confirmation Nbr. 2035672 / CLSLP

**OPPORTUNITY #4:**

# ADVERTISING & MARKETING

We value the impact of efficient marketing across all model lines and departments, that is up to date and utilizes media trends. Targeting the right consumer through social, digital, grass roots and traditional advertising outlets with an analysis on return will achieve this. We will address all facets of the customer buying cycles in all advertising and marketing. Keeping on top of advertising trends, we use cutting edge digital marketing to maximize marketing efficiency and we will aggressively invest the majority of our marketing and advertising budget into digital marketing.

We have on our side a proven marketing strategy that works to target consumers effectively. Our strategy is continuously monitored in order to ensure efficiency fiscally, as well as through guest satisfaction. We invest in marketing data analytics as a valuable



tool that has proven success, enhancing search engine optimization and tracking every point leading to the transaction. Our marketing strategy continuously improves while maximizing every dollar spent on the process.

Our marketing in action sells the right vehicle to the right consumer, while optimizing the overall advertising expense used to achieve each sale. However, we will not stop with just the variable operations marketing analysis; we will begin a Fixed Operations campaign that will market to every customer at every level of the customer lifecycle to ensure customer retention and increase light maintenance sales.

**OPPORTUNITY #5:**

# PEOPLE

Our impact in the local and surrounding communities matters from both an internal and external perspective. This begins with employee satisfaction, where we strive to employ top talent and return to them an empowering and inclusive environment. We are diligent in monitoring the Employee Satisfaction Index (ESI) and implementing employee retention programs; retaining talent that is passionate about their work will deliver the best experience in all departments.

Our value for community means that reputation and experience are top priority. The Customer Service Index (CSI) is a tool we value to ensure our impact is entirely positive. We are relentless in ensuring our people, employees and clients alike, walk through our doors happy.

Our attitude spans far beyond our doors. We are passionate about offering best in class service, while being strong community leaders, with deep rooted family values. We will make our impact by being involved in the community, having an excellent relationship with the local government, and ensure an outstanding reputation with the Better Business Bureau. As a business we strive to increase market share and profitability, but we know that does not happen without the foundation that is built on the valuable people we employ and serve in our communities.



Thank you for taking the time to review our submission and approach to this opportunity. I'm not sure there is another candidate that is more passionate about Motorcars Honda than Foundation Automotive. We truly love the Honda brand and revere the opportunity to imbed ourselves in the local Cleveland Heights community.

An ideal match between our teams' passion and the long-standing reputation and promise of the Honda brand; we look forward to progressing forward with this opportunity, together.

Yours truly,

**Kevin Kutschinksi**
President & CEO
Foundation Automotive Corp.