## AFFIDAVIT OF CHUCK KRAMER

BEFORE ME, the undersigned notary, on this day personally appeared Chuck Kramer, who, after being by me first duly sworn, did upon oath depose and say:

1. "My name is Charles 'Chuck' H. Kramer. I am over the age of 18, of sound mind, and otherwise competent and authorized to make this affidavit. The facts stated in this affidavit are true and correct and are within my personal knowledge."

2. "I am the Chief Operating Officer of Foundation Automotive Corporation, a Canadian company. FA OH HND, LLC is a Delaware limited liability company and an affiliate of Foundation Automotive Corporation (collectively, "Foundation Auto")."

3. "Motor Cars Inc. owned and operated a motor vehicle dealership known and doing business as "Motorcars Honda", and its corporate affiliate owned operated a motor vehicle dealership known and doing business as "Motorcars Toyota.""

4. "Foundation Auto sought to purchase Motorcars Honda and Motorcars Toyota, and entered into a Management and Operations Agreement (the "Management Agreement") with Motor Cars Inc. until such a time that Foundation Auto was approved by the Manufacturers (Honda and Toyota) and purchased the two dealerships. Under the Management Agreement Foundation Auto would manage the business operations of both dealerships, including selecting and employing all personnel necessary to service the business of the dealerships."

5. "Pursuant to the Management Agreement, Foundation Auto only employed personnel only on an at-will basis while the Agreement was in force."

6. "I hired Kenneth Banks to work as General Manager of Motorcars Honda, and to also work as General Manager of Motorcars Toyota at a future date. He was an at-



will employee and reported to Kevin Kutschinski and myself. Mr. Banks' first day of work as General Manger of Motorcars Honda was January 7, 2019."

7. "Mr. Banks' temporary pay plan was $10,000 per month. Mr. Banks and Foundation Auto had negotiated Mr. Banks' permanent pay plan which included several other terms of compensation and benefits. However, Mr. Banks' permanent pay plan's implementation was dependent upon Foundation Auto actually purchasing Motorcars Honda and Motorcars Toyota **and** Mr. Banks investing 25% into the purchase of Motorcars Honda and 25% into the purchase of Motorcars Toyota. Until this occurred, Mr. Banks was paid only on his temporary pay plan."

8. "The sale and purchase of dealerships is a complicated and detailed process that requires significant amounts of documentation and due diligence. Furthermore, the sale of a dealership is dependent upon the approval from the Manufacturer of the sale and the subsequent owner(s)."

9. "I asked Mr. Banks to provide CSI ("Customer Satisfaction Index") data and other performance indicators from auto dealerships he previously worked at. This information is required by the automotive Manufacturers in order to approve a dealer operator/dealer principal. Mr. Banks would not be able to purchase his 25% of each dealership, nor work on a permanent basis as General Manager, without the Manufacturer's approval."

10. "Almost immediately, Mr. Banks struggled with executing company initiatives and with building rapport with the staff he was supposed to lead. During his first staff meeting, he announced that he was a former MMA fighter and 'could kick everyone in the room's ass'. He continually disregarded my direction and attempts to

have him perform his duties in accordance with both industry best practices and the Management Agreement the company was subject to. He kept attempting to bring in new personnel and to change the processes that the current owners were using, which was beyond his authority given to him. Mr. Banks' conduct created conflict on an almost daily basis."

11. "Mr. Banks never provided CSI data nor performance indicators from his previous dealerships, despite my repeated requests and despite his assurances that he would provide the information."

12. "Mr. Banks assured me on several occasions that he had the capability to purchase the 25% ownership interest in both of the dealerships. However, we later learned from him that he did not have the money to purchase and was having difficulties with obtaining financing. Subsequently, we learned any lender he was speaking to would require a pledge of 100% of the company's outstanding shares, not simply his 25% interest. This was impossible due to the policies and limitations the Company was subject to."

13. "Mr. Banks sent an email on February 13, 2019, stating that he was recently diagnosed with MS, he had no symptoms, and that it did not affect his ability to work."

14. "Based on that email, I did not know that Mr. Banks might require reasonable accommodation in order to perform his job."

15. "Mr. Banks did not request a reasonable accommodation from me at any time."

16. "Further, I consider that we engaged in the interactive process with Mr. Banks because he was informing us of his diagnosis with MS, and then explaining that he had no symptoms, nor did it affect his ability to perform his duties at work."

17. "In March of 2019, I recommended that Mr. Banks' employment be terminated because he was repeatedly insubordinate, he did not have the confidence of the staff, and he did not provide documentation required by the factory in order to be General Manager. He was terminated on March 7, 2019. I never considered his diagnosis of MS in my recommendation to terminate."

18. "The final decision to terminate Kenneth Banks's employment had nothing to do with his medical condition nor with accommodating any medical condition. Particularly because Mr. Banks stated that 'he had no symptoms, and that it did not affect his ability to work'."

FURTHER AFFIANT SAYETH NAUGHT.

_____
CHUCK KRAMER

THE STATE OF       §
                   §
COUNTY OF          §

SWORN TO AND SUBSCRIBED BEFORE ME by Chuck Kramer on the 15 day of July, 2022, to certify which witness my hand and seal of office.

_____
Notary Public, State of

-4-