UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KENNETH BANKS, | ) | CASE NO.   1:20-cv-02026 |
| | ) | |
| Plaintiff, | ) | JUDGE DAVID A. RUIZ |
| | ) | |
| v. | ) | |
| | ) | MEMORANDUM OPINION AND |
| FOUNDATION AUTOMOTIVE CORP., *et al.*, | ) | ORDER |
| | ) | |
| | ) | |
| Defendants. | | |

## I.      INTRODUCTION

Before the Court is a diversity action by Plaintiff Kenneth Banks against Defendant Foundation Automotive Corp., Motorcars Honda, and various individual principals/employees of Defendant, alleging, *inter alia*, that Defendants induced Banks to relocate to Cleveland, Ohio to become general manager/managing partner of two automobile dealerships Defendant Foundation sought to acquire, but then breached the agreement while unjustly enriching themselves, and improperly terminating Banks' employment. R. 9 (Amended Complaint).

In particular, the amended complaint contends that once Banks began employment with Defendant, he was denied reasonable accommodation for a disability under Ohio law and was then terminated as retaliation when he requested adjustments in his working hours. *Id.*, PageID#: 88, 90. In addition, the amended complaint asserts that Defendants unjustly enriched themselves by using Plaintiff's status as an African American while seeking approval from Honda and Toyota to purchase dealerships from those entities (*id.*, PageID#: 87). Moreover, the amended complaint

also maintains that Defendants defrauded Plaintiff by inducing him to relocate and work for them only to then terminate him after Plaintiffs had obtained the dealerships they had sought. *Id.* PageID#: 92-93. Further, the amended complaint alleges that Defendants breached a contract with Banks (*id.*, PageID#: 85) and that Banks relied on Defendants' promises to his detriment. *Id.*, PageID#: 86.

The case was originally filed in Cuyahoga County Common Pleas Court but removed here based on diversity jurisdiction. R. 1.

Now pending is Defendants' motion for summary judgment. R. 44. Plaintiff has responded in opposition (R. 48), to which Plaintiff has replied. R. 51.

For the following reasons, Defendants' motion is granted in part and denied in part, as is more fully set forth below. Further, because the sole remaining issue is a state law contract claim involving less than $75,000.00, the matter is remanded to state court.

In addition, all other pending motions are denied as moot. *See*, R. 39, 40, 50, 52.

## II.    OVERVIEW

This action involves two sets of claims—one set growing out of a contractual employment relationships between Plaintiff and Defendants, and the second set arising from Plaintiff's allegation that he was improperly terminated because of his disability. The individual allegations of the amended complaint will therefore be collected and analyzed accordingly.

As an initial matter, there were two separate contracts operating at the same time. First, there is a written contract with some provisional terms and other permanent terms. This contract, discussed further below, began before the claimed events in the amended complaint took place and was neither formally completed nor allegedly breached but ended when its principal purpose was frustrated by a third party. Next, and within the same time, there was an oral implied contract

in fact under which Banks was employed for a few months as an at-will employee before the permanent terms of the written contract took effect. This is while the parties were still subject to the provisional terms of the written contract and without foreclosing future performance under the permanent terms.

The Rule 56 evidence, as set forth below, shows that Banks was not unlawfully terminated under the oral implied contract, with Defendants thus being entitled to summary judgment as to that contract. The same evidence, however, shows that there are issues of fact as to Banks' termination under the written contract, thus precluding summary judgment on that claim. However, the evidence is also clear that because the written contract ended by frustration of purpose when a third party prevented the contract's completion, any damages for breach are also limited to those arising prior to the ending of the contract.

As to Plaintiff's disability discrimination claims, the Rule 56 evidence is clear that Defendants are entitled to summary judgment. The uncontroverted evidence is that although some Defendants were aware prior to Banks' termination that Banks believed he had an undiagnosed medical condition, there is no evidence that any Defendant knew Banks was disabled by that condition – indeed, the evidence is that Banks assured Defendants that he was not disabled. Further, the undisputed evidence is that Banks never requested an accommodation for that condition/disability and that the one request he made for a work accommodation not specifically connected to a claimed disability, was granted by Defendants. Thus, summary judgment will be granted to Defendants on the disability claims.

In addition, because only a narrowly defined state law contract claim remains and the evidence shows that any potential damage amount from such claim would necessarily be under the $75,000.00 jurisdictional threshold federal diversity jurisdiction, the matter will be remanded

to state court for further proceedings.

III.    FACTS

A. <u>Background facts</u>

The background facts presented below are not in dispute, except where expressly noted.

Plaintiff Kenneth Banks, who is an African American man, was working as general manager of a Ford dealership in Levittown, New York when, in late 2018, he was recruited by Chuck Kramer and Kevin Kutschinski of Defendant Foundation Auto Group to be general manager and managing partner of one or more auto dealerships that Foundation was interested in acquiring. R. 44, PageID#: 667; R. 48, PageID#: 738-39.

During the time Plaintiff was discussing and considering accepting Foundation's offer through the events at issue, Banks was purportedly afflicted with multiple sclerosis (MS), although no symptoms were then apparent, and no diagnosis had then been made. Banks states that his MS later manifested itself in symptoms such as fatigue and depression, for which he took several medications. R. 48, PageID#: 739. Plaintiff further states that his MS affected his ability to care for himself, to perform manual tasks and to walk. *Id.* That said, Banks also stated under oath in his deposition for this case that he did not tell Foundation about his MS until February 13, 2019 – which is after he had accepted Foundation's offer on December 12, 2018. *Id.*; R. 44, PageID#: 667.

That offer was for Banks to serve as the general manager and managing partner of two dealerships in Cleveland, Ohio that Foundation intended to purchase—a Honda dealership and a Toyota dealership—and for Banks to invest his own funds for a percentage ownership in these dealerships. R. 44, PageID#: 667; R. 48, PageID#: 739. Because Banks did not himself have sufficient moneys to make the required partnership investment, he told Chuck Kramer that he

4

would need to obtain a loan to complete the buy-in to the partnership, to which Kramer agreed. R. 48, PageID#: 739-40.

After the parties had orally agreed to the deal described above, Defendant purportedly sought to improve their chances of finalizing their purchase of the dealerships by promoting to Honda and Toyota Banks' status as a racial minority member of the ownership team who would also be general manager. *Id*., PageID#: 740. Banks also submitted material to Honda and Toyota reflecting his intention to be both an equity partner and general manager of the dealerships. *Id.*

On December 28, 2018, Banks signed a contract with Foundation – labeled as the Pay Plan – which encompassed the terms noted above, and further stated that its permanent terms would not take effect until Foundation closed on the purchase of the two Cleveland dealerships. R. 44, PageID#: 664.

In January 2019, Banks moved from New York to Cleveland and began work on January 7, 2019. *Id.* At this time, Foundation had not yet acquired the two Cleveland dealerships but was operating the Honda dealership under a management agreement with Defendants Charles and Trevor Gile, principals in Motor Cars Honda and Motor Cars Toyota. R. 44, PageID#: 665. Under the management agreement, Foundation would operate the Honda and Toyota dealerships until the two auto manufacturers approved the final dealership sales to Foundation. *Id*.

However, while Honda had approved the management agreement at the time Banks relocated to Cleveland, Toyota had not, meaning that when Banks arrived for work, he could only work at the Honda dealership under the management agreement. *Id*. Moreover, because the final sale of the Honda dealership to Foundation had not yet occurred and because, under the management agreement, Foundation did not have authority to make major changes to personnel or policy, Banks worked at the Honda dealership as an at-will employee of Motor Cars Honda,

not for Foundation, but was paid under the terms of the Pay Plan. *Id.*

To be clear, and as will be examined later, when Banks began working at Motor Cars Honda on January 7, 2019, he was **both** a **contractual party** to the Pay Plan contract with Foundation that contained both immediate provisional terms and permanent terms**, as well as** an **at-will employee** of Foundation, so engaged to be general manager of the Honda dealership prior to Foundation assuming ownership.

In January 2019, two sequences of events began that bear directly on Banks' claims in this matter. As noted above, these facts are arranged into two sections.

The first sequence of events concerns what Banks did or did not do to complete Foundation's acquisitions of the dealerships and to effectuate his partnership buy-in as contemplated by the Pay Plan contract.

On January 10, 2019, three days after beginning work, Plaintiff Banks informed Foundation by email that he was "ready to go with my investment [in the partnership] … [and could close on that] within 60 days." *Id*., PageID#: 669. In fact, as Banks testified in his deposition, he had only submitted a "verbal application" for a loan at that time. R. 43-2, PageID#: 588. Moreover, Banks also testified that as of January 17, 2019, the prospective lender still required additional documents from Foundation before "mov[ing] forward with my loan." *Id.*, PageID#: 598. To that point, Banks acknowledges that he did not have a signed partnership agreement with Foundation at that time, nor was one ever signed. R. 43-1, PageID#: 416.

But while Banks was "moving forward" with the loan application, the uncontroverted affidavit of Chuck Kramer, the chief operating officer of Foundation, R. 44, Attachment 3, states that Foundation learned that "any lender [Banks] was speaking to would require a pledge of 100% of the company's outstanding shares [as loan collateral], not simply [Banks'] 25% interest. This

6

was impossible...." *Id.*, PageID#: 701.

Further, in addition to and separate from the loan application, the unrefuted Kramer affidavit states that Banks was required by both Honda and Toyota to furnish Customer Satisfaction Index (CSI) data and "other performance indicators from dealerships he previously worked at," as a condition of the manufacturers' approval of a sale and of Banks becoming a 25 percent owner and general manager. *Id.*, PageID#: 700. The uncontested Rule 56 evidence is that Banks never provided this documentation.

The unrefuted evidence from the affidavit of Carl Dahlen, general counsel for Foundation, shows that Foundation closed on the acquisition of the Honda dealership on August 30, 2019 and that the deal for the acquisition of the Toyota dealership ended unsuccessfully on July 10, 2019. R. 44-11, PageID#: 721.

The next sequence of events concern Banks' disability claim.

On January 16, 2019, Banks told Kevin Kutschinski, Foundation's chief executive officer, that he would be working fewer hours per week than originally anticipated due to fatigue. R. 43-1, PageID#: 370-374. This communication to Foundation by Banks about fatigue did not mention MS, which, as noted above, Banks acknowledges was not directly communicated to Foundation until nearly a month later, or February 13, 2019. *Id.*, PageID#: 377. No one at Foundation or Honda Motorcars objected to Banks' decision to reduce his work hours. *Id.*, PageID#: 378-380.

Significantly, Banks admits that this request to work fewer hours was the only request for a reasonable disability accommodation he made to Foundation. R. 43, PageID#: 623. Banks further admits that he did not explain the specifics of his MS-related disability to Foundation because he "didn't really know the specific of the MS symptoms." *Id.*, Page ID No. 635. In addition, Banks testified that after he disclosed his MS to Foundation in February, "[t]here were

no negative discussions about me having MS at all," but instead "[t]hey were supportive of me." *Id*., PageID#: 492. Significantly, all Banks told Foundation by email was that "I was recently diagnosed with MS (does not affect my work at all) though I have zero symptoms and I look to be as healthy as I am now in twenty years." *Id*., PageID#: 397.

Banks also testified that he personally did not then know how his MS was affecting him. *Id*., Page ID No. 493. Banks nonetheless now alleges that following his disclosure of the MS *diagnosis* Foundation had a duty to begin an "interactive process," including asking him to see a physician, to determine if the MS had an effect on his ability to work. *Id.*, PageID#: 493-94.

Banks was terminated on March 7, 2019. *Id*., PageID#: 475-76. The stated reasons for the termination, according to Banks, were that he "couldn't prove [his] ability to buy in[to] [the partnership]" and because another employee felt "uncomfortable" upon being told by Banks that he [Banks] was "an MMA [Mixed Martial Arts] fighter." *Id*., PageID#: 479-80. Chuck Kramer, Foundation's chief operating officer, testified in his affidavit that he recommended Banks be terminated because "he was repeatedly insubordinate, he did not have the confidence of the staff, and he did not provide [the] documentation required by the factory in order to be General Manager." R. 44, Attachment 3, PageID#: 702.

Banks' actual termination was performed by Jeff Jeans, founder of a Texas-based Human Relations (HR) firm which was retained by Chuck Kramer to handle HR matters related to Foundation's acquisition of the Cleveland Honda dealership. R. 44, Attachment 7, PageID#: 708. Jeans' affidavit states that he personally met with Banks on March 7, 2019, and notified him that Foundation was terminating his employment, effective immediately. *Id*. Although the affidavit does not directly relate the full details of the conversation between Banks and Jeans, Jeans' affidavit states that he was told by Kramer that Banks was terminated because "Banks had not

produced CSI data and performance information from the dealerships at which Mr. Banks had previously worked," and because Banks "refused to follow company process, repeatedly attempted to make wholesale changes to the operation that were prohibited by the Management Agreement with Motor Cars Inc. and that Mr. Banks did not have the confidence of the staff." *Id.*, PageID#: 708. Banks was offered $30,000.00 severance pay, which reflected three months of base pay at $10,000.00, such severance amount to be in addition to the base pay earned for two months employment. *Id.*, Page ID#: 709. Jeans' affidavit further states that he did not know about Banks having a medical condition and that his employment was terminated solely for the reasons stated. *Id.*

B. <u>Banks' Complaint</u>

As briefly summarized above, Banks' amended complaint (R. 9, PageID#: 84-94) presents seven counts:

Count One – Breach of contract against Foundation and Motor Cars Honda;

Count Two – Promissory estoppel against Foundation;

Count Three – Unjust enrichment against Foundation;

Count Four – Violation of Ohio's disability discrimination law/denial of reasonable accommodation against Foundation and Motor Cars Honda;

Count Five – Violation of Ohio's disability discrimination law/retaliation against Foundation and Motor Cars Honda;

Count Six – Violation of Ohio's disability discrimination law against Defendants Kutchinski, Kramer, Chick Gile and Trevor Gile, accused of aiding and abetting Foundation and Motor Cars Honda; and

Count Seven – Fraud against Foundation.

Banks seeks damages of past and future lost wages, bonuses, deferred compensation and other benefits; moving expenses; a twenty-five percent interest in Foundation; damages for emotional distress, reimbursement of expense incurred in trying to obtain benefits due plus in seeking substitute employment. *Id*. PageID#: 94-96.

C. Defendants' motion for summary judgment

Defendants' motion for summary judgment (R. 44) argues, *inter alia*, that:

As to Ground One, Defendants contend that the Pay Plan contract was breached since the condition precedent to that contract's formation never occurred. *Id.*, PageID#: 670-71. Specifically, they argue that for the Pay Plan contract to take effect, Foundation needed to acquire *both* the Honda and Toyota dealerships. *Id*. But because Foundation did not acquire the Honda dealership until August 30, 2019, or after Banks was terminated, and further because it never closed on the proposed purchase of the Toyota dealership, the condition precedent to the Pay Plan contract was never met and Banks remained always an at-will employee subject to termination at any time. *Id.* Alternatively, they maintain that it was Banks who breached the contract by not being able to purchase the twenty-five percent equity share in the partnership. *Id.*

Regarding Ground Two, the Defendants' motion asserts that promissory estoppel cannot be asserted because any oral promises made cannot alter the terms of an unambiguous written contract, which itself stated that it comprised the entire agreement between the parties. *Id.,* PageID#: 672-675.

Further, the Defendants maintain that no unjust enrichment took place for three reasons. First, Foundation never acquired the Toyota dealership and so cannot be said to have received any benefit from Banks' participation in making an application for that dealership. *Id*., PageID#: 675. Next, Banks was terminated five months before Honda approved Foundation's application

for that dealership. *Id*. Finally, Defendants argue that Banks has not established exactly what the purported benefit was nor quantified its value. *Id.*

As to the discrimination claims against the Foundation defendants, the motion first asserts that Banks cannot make out a prima facie case of discrimination. To that point, Defendants note that when Banks first informed Foundation of his MS, he told Foundation, as detailed above, that the MS did not affect his work at all and that he had no symptoms. *Id*., PageID#: 677. Defendants further cite to Banks' testimony that while he was at Foundation he did not consider himself to have a disability. *Id*. Moreover, Defendants point out that Banks admits that the only "reasonable accommodation" request he made was for shorter hours, which he made due to unspecified fatigue, but never told Foundation that the reason for the request was related to a medical condition or MS. *Id*. In addition, the reasonable accommodation request was made almost a month before Banks was diagnosed with MS and was made while he states he was experiencing "zero symptoms." *Id*.

Defendants also contend that Banks was terminated for the legitimate non-discriminatory reasons that: (1) he could not invest the 25% ownership interest in the dealership; (2) he threatened staff members; and (3) he was insubordinate. *Id.*

As to the retaliation claim, Defendants contend first that merely requesting an accommodation in a work schedule is not a "protected activity," the denial of which would then trigger a retaliation claim. *Id.*, PageID#: 679. Moreover, as stated above, Defendants maintain that the simple request for reduced hours here was not a request for reasonable accommodation of a disability since, as noted, while Banks made the request to deal with general fatigue, that reason was never communicated to Defendants as connected with a medical condition nor was the fatigue then linked to MS by Banks himself. *Id*. Further, as also related earlier, the request

was made almost a month before Banks was diagnosed with MS. *Id.* Thus, Defendants reason, they could not retaliate against Banks based on the request to change his work hours when they had no knowledge at that time that Banks suffered from any disability. *Id.*

In addition, as concerns the aiding and abetting discrimination allegation against the Motor Cars defendants, the Defendants assert that none of these Defendants knew of Banks' disability before Banks made the request for reduced work hours and none of the Motor Cars defendants instructed Foundation to impose longer work hours on Banks. *Id.*, PageID#: 680.

Finally, as to the fraud claim, the Defendants state that Ohio courts applying Ohio law "routinely reject fraud claims based on an alleged breach of contractual duties." *Id.*, PageID#: 681. They also argue as relates to other allegedly fraudulent statements that Banks cannot prove the necessary elements of fraud and/or that the claims fail for lack of specificity. *Id.*

## IV.    ANALYSIS

The standard for summary judgment under Rule 56 of the Federal Rules of Civil Procedure is well-established. The Rule provides that a court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). In making this determination, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kres & Co.*, 398 U.S. 140 (1970). The moving party bears the initial burden of identifying those portions of the record demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once that burden is met, the nonmoving party must "set forth specific facts showing that there is a genuine issue of material fact for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Once the burden has shifted, the nonmoving party may not rest on its pleadings or merely reassert its previous allegations. *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In ruling on a motion for summary judgment, the district court is not "obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InteRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Instead, the court is entitled to rely upon only those portions of the relevant evidence "specifically called to its attention by the parties." *Id*.

A. <u>Plaintiff's contract claims</u>

Under Ohio law, which all parties agree applies here, the essential elements of a breach of contract claim are: (1) the existence of a contract; (2) performance by the plaintiff; (3) a breach by the defendant; and (4) loss or damages to the plaintiff. *Kline v. Mortgage Electronic Registration Sys., Inc.*, 704 Fed. Appx. 451, 463 (6th Cir. 2017) (citation omitted). In addition, Ohio law defines a "condition precedent" as a condition "that is to be performed before an agreement becomes effective, and which calls for the happening of some event or the performance of some act after the terms of the contract have been agreed on, before the contract shall be binding on the parties." *Wroblesky v. Hughley*, 169 N.E.3d 709, 715 (Ohio App. 11th Dist. 2021) (internal quotation omitted). Moreover, Ohio law further states that when a condition precedent is not satisfied, the parties are not obligated to the terms of the contract. *Campbell v. George J. Igel & Co.*, 3 N.E.3d 219, 223 (Ohio App. 4th Dist. 2013).

The determination of whether a contract provision is a condition precedent or merely a promise to perform is a question of the parties' intent. *Id.* Conditions precedent are disfavored in law and courts will avoid construing provisions as such unless the intent of the agreement is plainly to the contrary. *Id.* The construction of a written contract is a matter of law to be determined by the court. *Wroblesky*, 169 N.E.3d at 714 (citation omitted).

B.  Pay Plan contract

Initially, both parties agree that the Pay Plan, which addresses how Banks was to be compensated after he assumed the duties of general manager and managing partner of both the Honda and Toyota dealerships, constituted the "contract" between the parties. Starting from this premise, Defendants argue that the parties intended that a condition precedent to the contract becoming effective was that Foundation acquire ownership of both the Honda and Toyota dealerships in question. R. 44, PageID#: 671. They point to language that indicates that the contract as it relates to Banks' role as General and Managing Partner at the "Dealerships" (plural) was to "take effect on the date Foundation Auto closes on the purchase of the Dealerships." *Id*. (quoting contract).

Banks, for his part, argues that "[w]hile on initial blush it may appear that the language [cited by Defendants] is unambiguous" (R. 48, PageID#: 759), there are two other provisions in the contract that suggest a different trigger for its effectiveness. First, Banks points to language that states that Banks' "title" of General Manager and Managing Partner is "subject to OEM application process" but does not indicate it is connected to closing on the dealership acquisitions. *Id.* Next, he observes that the contract itself provides a start date of January 7, 2019, not a later date associated with the purchase of the two dealerships. *Id.*

Examining the contract as a whole, there is no ambiguity as to its terms or how those terms come into effect in the circumstances of this case. Plainly, the contract, as Banks noted, began on January 7, 2019, or well before Banks arrived in Cleveland and before the acquisition of any dealership.  Thus, while the future acquisition of Honda and Toyota dealerships by a partnership consisting of Banks and Foundation was a purpose of the contract and was anticipated in it, neither the formation of the partnership nor its acquisition of the two dealerships were conditions

14

precedent to the contract's formation.

In other words, the Pay Plan contract set forth a number of different obligations and responsibilities that began with Banks' relocating to Cleveland and were to culminate in Banks' entering into the partnership and assuming new duties with new compensation upon the parties' acquisition of the two dealerships. Simply put, the contract of January 7, 2019 contains: (1) the obligations of the parties before such dealership acquisitions followed by (2) different obligations that would become effective after the dealerships were successfully acquired. So understood, while closing the two dealership acquisitions was a contractual precondition for certain obligations to occur, it is incorrect to describe those closings as "conditions precedent" to the entire contract becoming effective.

This understanding is easily established by the terms of the contract. Quite before either party had an obligation that would be triggered in connection with the two dealer acquisitions, such as Banks being required to buy-in to the partnership or Defendants being required to give Banks a certain operational role, the parties' contract (1) required Banks to relocate to Cleveland and begin work on the dealership acquisitions while (2) Defendants were required to compensate Banks for the relocation and during the period while all parties were pursuing the acquisitions. It is also clear that the contract then further set out that the closing of those dealership acquisitions was to give rise to new obligations and duties—described therein as "permanent terms"—which are more fully described in the contract and here below.

However, as noted above, Toyota ended the possibility of a dealership sale to Foundation on July 10, 2019. While the failure to complete the acquisition of the Toyota dealership on that date did not constitute a failure of a condition precedent to forming the parties' written contract,

that failure is more correctly understood as a frustration of the contract's principal purpose.[1]

Section 265 of the Restatement (Second) of Contracts addresses the equitable concept of frustration of purpose and states:

> When, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.

The Comments to the Restatement § 265 were quoted in *Printing Industries Ass'n of Northern Ohio, Inc., et al., International Printing and Graphic Communications Union, Local No. 56, et al.*, 584 F. Supp. 990, 1000 (N.D. Ohio 1984) as providing "useful insight into the factors that must be established to make out a claim of substantial frustration." Specifically:

> First, the purpose that is frustrated must have been the principal purpose of that party in making the contract. It is not enough that he had in mind some specific object without which he would not have made the contract. The object must be so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense. Second, the frustration must be substantial. It is not enough that the transaction has become less profitable for the affected party or even that he would sustain a loss. The frustration must be so severe that it is not fairly to be regarded as within the risks he assumed under the contract. Third, the non-occurrence of the frustrating event must have been a basic assumption on which the contract was made. This involves essentially the same sort of determinations that are involved under the general rule of impracticability.

---

[1] While closing on both the Honda and Toyota dealership acquisitions is a contractual contingency to implementing the contract's permanent terms, the contact itself does not specify a date at which the dealership acquisitions must occur nor is there contract language specifying that the contract would lapse if closing did not occur by an agreed to date. Thus, the contract does not provide an express means to terminate itself. See, *Crown Property Development, Inc. v. Omega Oil Co.,* 681 N.E. 2d 1343, 1348-49 (Ohio App. 12th Dist. 1996).  Further, the equitable doctrine of impossibility of performance does not apply here since the foundation for that doctrine is an unforeseen event that renders performance by just one party impossible. *Paulozzi v. Parkview Custom Homes, L.L.C.*, 122 N.E. 3d 643, 649 (Ohio App. 8th Dist. 2018) (citation omitted). While Defendants might argue that this does apply here on the grounds that it was Banks who was unable to obtain bank financing at the time of the Honda acquisition, this approach is unavailing because there is no contractual requirement that financing be obtained through a commercial lender (*i.e.*, Banks could acquire the funds by other means) and, as noted, the contract required him to have the funds at the moment of the last or second acquisition, which event had not yet occurred and could not occur due to Toyota's action.

The Sixth Circuit in *Karl Wendt Farm Equipment Co., Inc. v. International Harvester, Inc.* 931 F.2d 1112, 1120 (6th Cir. 1991) stated that, "like the doctrine of impracticability, the doctrine of frustration is an equitable doctrine which is meant to fairly apportion risk as between parties in light of unforeseen circumstances. It is essentially an implied [contract] term which is meant to apportion risk as the parties would have had the necessity occurred to them." *Groseth International, Inc. v. Tenneco, Inc.,* 410 N.W. 2d 159 (Sup. Ct. S.D. 19987), a case that was cited with approval by the Sixth Circuit in *Karl Wendt* in interpreting the doctrine of frustration, *see*, *Karl Wendt,* 931 F. 2d at 1119, held that the doctrine of frustration turns on whether the frustrating event was foreseeable to the parties at the time the contract was made. "If the frustrating event was neither foreseen nor reasonably foreseeable, the promise was not in fact intended by the parties to extend to such contingency. If the event was foreseeable when the contract was made, then the party will be presumed to have assumed the risk of its occurrence." *Groseth*, 410 N.W.2d at 116 (citations omitted). Moreover, "[t]he application of the doctrine of commercial frustration is a question of law to be determined by the court from the facts of the case." *Id*. *See also*, *MCS Marketing v. University of Akron*, 2004 WL 2291430, at *5 (Ohio Ct. Claims Sept. 30, 2004, citing *Printing Industries*, 584 F. Supp. at 1000).

Here, the evidence viewed under the summary judgment standard shows that Foundation is entitled to the equitable defense of frustration of purpose to Banks' breach of contract claim.

As to the first factor—that the frustrated purpose be the "principal purpose" of the contract—Foundation essentially contends that the frustrated principal purpose of the contract was its acquisition of both the Honda and Toyota dealerships in partnership with Banks. To that point, as *Groseth* observed, "[i]t is not enough that [one party] had in mind a specific objective without which [it] would not have made the contract. The object [which was frustrated] must be

so completely the basis of the contract that, *as both parties understood it*, without it the transaction would make little sense." *Groseth*, 410 N.W. 2d at 165 (emphasis added).

There is clear Rule 56 evidence to support a finding that both parties understood that it "would [have made] little sense" for either of them to have entered into this contract if it did not involve Foundation acquiring two Cleveland dealerships with Banks acquiring ownership at these dealerships, which he was to manage. To that end, Banks' clear intention was to acquire an ownership interest and to not be merely an employee. For its part, Foundation was seeking to acquire two specific dealerships in the same geographical area at approximately the same time for which it desired an equity partner.[2] It would have made little sense for either of the parties to make a contract that did not address these objectives, which were linked in the specific contract terms.

The second factor required for establishing frustration is that the frustration be "substantial." *Id.* That is the frustration must be so severe that "it is not fairly to be regarded as within the risks that [Foundation] assumed under the contract." *Id.* This factor is related to the third and final factor which is that the frustrating event involve a "basic assumption" of the contract. *Id*. As noted above, these factors involve the issue of whether the parties here foresaw or reasonably could have foreseen that Toyota would decline to complete a sale. Plainly, they did not expressly contemplate this, as evidenced by the lack of any contractual provisions for such an occurrence.

Thus, as a matter of law, the acquisition of both the Honda and Toyota dealerships in a

---

[2] A January 2019 email from Chuck Kramer to Banks (R. 44-12) emphasizes that Foundation's goal is to "get a person in the dealership that [sic] that has personal equity and can obtain their [sic] own funds." He also stated that the "other operators [of Foundations dealerships] have invested their own capitol [sic] to be the DP or managing partner" and "we need to stand firm in our business model."

partnership between Foundation and Banks was the "principal purpose" of their contract. Under the doctrine of commercial frustration of purpose, any obligations under the contract ended in July 2019 with the substantial unforeseen event that frustrated the basic assumption of the contract, *i.e.,* Toyota declining to go forward towards a sale to Foundation.

This conclusion leads directly to a discussion of Foundation's alternative theory for summary judgment on Count One, which is that it was Banks who breached the contract by not making the required partnership investment buy-in at the time of the closing on the Honda dealership. R. 44, Page ID No. 672. This theory is based on the well-established law that a material breach of contract, *i.e.*, the failure to do something that is so fundamental to the contract, defeats the essential purpose of the contract or makes it impossible for the other party to perform. *Price v. KNL Custom Homes, Inc*., 28 N.E.3d 640, 651 (Ohio App. Ninth Dist. 2015) (citation omitted). The determination of whether a breach was a "material breach" is generally a question of fact. *Whitt Sturtevant, LLP v. NC Plaza LLC*, 43 N.E. 3rd 19, 30 (Ohio App. Tenth Dist. 2015) (citation omitted).

Foundation's argument is that after Plaintiff assured Foundation that he could fund the investment buy-in, Banks then never applied for a loan towards that end and eventually advised Foundation that he did not have the personal funds to complete such a transaction. R. 44, Page ID No. 672. Banks, for his part, points out that the contract itself requires that the partnership buy-in is due upon the closing of both dealerships. R. 48, Page ID No. 759.

As noted above, a reading of the contract shows that the condition upon which Banks was to make a partnership buy-in was "on [the] **date** [singular] of close of Dealership**s** purchase at valuation negotiated by Foundation Auto with seller**s**." [emphases added]. The only way the above sentence can be read as being internally consistent with the contract as a whole is that

Plaintiff's buy-in payment for both dealerships was to be due on the date the last and final of the two dealership acquisition closings occurred.

That understanding necessarily means that **none** of the "permanent terms' of the contract came into effect here because both dealership purchases were never closed. To emphasize, since closing never occurred on both dealership purchases, the permanent terms of the contract were never brought into effect and the contract itself, as noted, ended when Toyota—the last of the two dealership acquisitions—declined to go forward with the sale to Foundation.

That said, however, as noted above, the contract as a whole contains terms that were to govern the period between the contract's inception and the moment when the permanent terms took effect or, as here, when the contract ended in July 2019. Thus, these initial or transitional terms of the contract were in effect during the time period here.

Those terms entitle Banks to receive a moving allowance of up to $20,000.00 and reimbursement of living expenses up to a maximum $1,700.00 per month for the period between relocation and the closing of the dealerships purchase. Banks' contention that these initial or transitional terms further include a base salary of $10,000.00 per month  and a guarantee of $30,000.00 per month constituting a base pay plus a net profit bonus computed from "Dealerships' net earnings before tax," is not supported by the contract language because these provisions, along with pro rata distributions of "excess cash and dividends,"  are specifically listed as a permanent terms of the contract, which, as noted, are to take effect only after closing on the purchase of both dealerships and are not otherwise specifically linked to a non-closing event (such as the relocation expense) or specifically designated (*i.e.*, living allowance) as operable "for the period between relocation and when the Dealerships purchase

closes."

Contrary to Foundation's argument, Banks cannot be liable for a breach of contract on the grounds that he failed to complete a partnership buy-in at the closing of the first dealership. Conversely, Banks cannot maintain a claim that Foundation breached the contract by failing to pay the base salary, a net profits bonus and/or the guarantee amount, as all these provisions are permanent contract terms that never came into effect since both dealerships were never acquired. Banks is entitled under the contract to the moving allowance and the relocation allowance.

In sum, from the contract inception until it ended in July 2019, under the terms of the contract alone Banks was entitled to up to $20,000.00 in relocation expenses and a maximum of $1,700.00 per month in living expenses. So understood, at a maximum that equals $11,900 in living expenses (7 months times $1,700 per month) plus up to $20,00.00 relocation expenses – or $31,900.00 in potential payments to Banks under the provisional or temporary terms of the contract.

C.  <u>Implied contract in-fact</u>

What employment conditions covered Banks' work at the Honda dealership, which he began upon arriving in Cleveland?

The uncontroverted Rule 56 evidence shows that "when Banks started his employment [at the Honda dealership which Foundation did not yet own], he only worked at the Honda store as an at-will employee of Motor Cars, Inc." and was "paid according to the Pay Plan." R. 44, PageID#: 665, n.3.

This statement involves two foundational points. First, it involves the management agreement between Foundation and Motor Cars, Inc. that governed how Foundation was to

operate the Honda dealership prior to Honda's final agreement to the dealership sale. Next, it involves what was an implied-in-fact oral contract between Foundation and Banks whereby Banks would operate the Honda dealership for Foundation during that same period.

First, as to the management agreement, that contract is in writing and not in dispute. R. 44-2. This agreement, as noted, is between Motor Cars, Inc. and its principals on one side and Foundation on the other. Banks is not a party. The agreement specifies that any employee hired by Foundation be at-will. *Id*., PageID#: 692. It also specifies that Motor Cars, Inc. must give its written consent to Foundation's hiring of employees (*id*., PageID#: 693) but indicates nothing about Motor Cars, Inc. or its principals having any role in terminating such employees.

In sum, as noted above, the permanent terms of the Pay Plan or contract between Banks and Foundation were not in effect at the time Banks was working at the Honda dealership. It is also clear that the Pay Plan itself does not involve Motor Cars, Inc. nor its principals, who are not signatories. The evidence also establishes that the management agreement between Foundation and Motor Cars, Inc. governed the operation of the Honda dealership, and that Banks acknowledges that he was never a party to that agreement. R. 43-2, PageID#: 616.

Thus, because the written Pay Plan contract's permanent terms between Foundation and Banks could not yet have come into effect for the reasons already stated and because no separate written contract exists in the record as to Foundation employing Banks to operate the Honda dealership under the management agreement, the evidence is that Foundation and Banks entered into an implied contract in fact for that purpose.

Pursuant to Ohio law the existence of an implied in-fact contract requires the essential contract elements of offer, acceptance, consideration and meeting of the minds but permits these elements to be established by inference from the circumstances. *Medical Mutual of Ohio v.*

*AirEvac EMS, Inc.,* 341 F.Supp. 3d 771, 779-80 (N.D. Ohio 2018) (citations omitted). In other words, the circumstances surrounding the parties' conduct establish "their tacit understanding" that an implied in-fact contract exists between them. *Id.*

Here, the Rule 56 evidence establishes that because the permanent terms of the Pay Plan contract had not yet come into effect, Banks was employed pursuant to an implied in-fact contract between Banks and Foundation, by which Banks was installed as manager of the Honda dealership pursuant to the management agreement between Foundation and Motor Cars. The fact that this implied-in-fact agreement between Banks and Foundation utilized the same $10,000.00 per month base pay amount as was used in the Pay Plan should not be confused with a belief that Banks was working under the permanent terms of the Pay Plan.

With the above in mind, the issue now becomes whether Banks' termination violated either the Pay Plan contract or the implied in-fact contract. In both cases, the following analysis is done without considering the discrimination claim, which will be considered separately.

As to the Pay Plan contract, it provides that Banks may be terminated by Foundation for: (1) breach of the partnership agreement (which was never executed) or (2) for "just cause/willful misconduct, without notice or pay in lieu of notice." R. 44-1. As to the implied contract, there is no dispute that it was at-will.

At-will employment in Ohio law permits termination for any reason which is not contrary to public policy. *Creveling v. Lakepark Industries, Inc*., 169 N.E. 3rd 21, 34 (Ohio App. 6th Dist. 2021) (citation omitted). Without here considering the discrimination claim, Foundation would incur no liability for terminating Banks under the implied in-fact contract.

Under the Pay Plan contract, the analysis is different. As noted, because Banks was not required by the permanent terms of this contract to buy into the partnership until the time of the

second or final dealership acquisition, he could not be terminated for failing to make a buy-in at the time the Honda dealership closed, which in any event was after his employment terminated. Multiple Defendant sources, cited above, provide such a failure to "buy-in" as a reason for his termination, but the contract's terms preclude summary judgment on that breach theory in favor of Foundation.

As to Defendants Motor Cars, Inc. and its principals, they are entitled to summary judgement on Count One—breach of contract—because the evidence fails to establish a material disputed fact that there was any express or implied contract between them and Banks .

D. Other contract claims

In addition to the claim of breach, Banks asserts in Count Two that under promissory estoppel the Foundation Defendants should be held to their promises of autonomy in operating the dealerships, a 25% ownership stake in the dealerships, and employment by Foundation even if the dealership acquisitions did not occur. R. 9, PageID#: 86.

Promissory estoppel applies where, in the absence of a written contract, a promise is made which the promisor reasonably expects will induce action or forbearance by the promisee. *Mers v. Dispatch Printing Co*., 19 Ohio St. 3d 100, 104, 483 N.E. 2d 150, 154 (1985). Where a written contract is unambiguous, it is proper to bar a promissory estoppel claim in a summary judgment. *Lippert v. Univ. of Cincinnati*, 1996 WL 566012, at *4 (Ohio App. 10th Dist. Oct. 3, 1996).

Here, the promissory estoppel claim only concerns alleged promises made prior to Banks relocating to Cleveland, which promises were encompassed in the Pay Plan contract that was found unambiguous. Thus, the Defendants are entitled to summary judgment as to Count Two.

Count Three—unjust enrichment—contends that Foundation received a benefit from Banks' status as an African American man in its application to acquire the Honda and Toyota dealerships but then terminated him before he could himself receive any benefits. R. 9, PageID#: 88. "Under Ohio law, the existence of a valid enforceable contract covering the subject of a dispute generally precludes a claim for unjust enrichment." *Cleveland Central Catholic High School v. Mills*, 125 N.E. 3d 328, 340 (Ohio App. 8th Dist. 2018) (citations omitted). While there may be an exception to this rule in the case of fraud, *id.*, such an exception does not apply here, as is more fully explained below.

Indeed, Banks pleaded a claim of fraud in Count Seven of the Amended Complaint. R. 9, PageID#: 92. However, that claim merely restates his prior claims for breach of contract and promissory estoppel in terms of fraud. To establish fraud under Ohio law it is necessary to show that the allegedly fraudulent representation was made with knowledge of its falsity or with utter disregard and recklessness for whether it was true. *Friedland v. Lipman*, 429 N.E. 2d 456, 459 (Ohio App. 8th Dist. 1980). To the extent that Banks claims that Defendants acted fraudulently in making statements and/or promises about items that were later incorporated into the Pay Plan contract, *i.e.*, regarding when the partnership buy-in was to occur or when Banks would be general manager of the Honda dealership, *see*, R. 9, PageID#: 92, those are fundamentally breach of contract claims and Ohio law rejects fraud claims based on alleged breach of contract. *Textron Financial Corp. v. Nationwide Mutual Ins. Co.*, 684 N.E. 2d 1261, 1270-71 (Ohio App. 9th Dist. 1996) (citation omitted). Courts do not permit parties to convert a breach of contract issue into a tort of fraud by "attacking the motive of the breaching party." *Id.*

As to any claims by Plaintiff that the Defendants, with knowledge of the falsity of the statements, nevertheless made representations not contained in the Pay Plan contract while

otherwise not intending to honor those promises, the Pay Plan contract itself states, *inter alia,* that the Pay Plan supersedes all "previous written or oral discussions or agreements that you had concerning your compensation." R. 44, Ex. A.  As such, the Pay Plan incorporates the long-established parol evidence rule which holds that the parties' final written agreement may not be modified, contradicted or supplemented by evidence of prior oral agreements. *Prentiss v. Goff,* 949 N.E.2d 560, 565-66 (Ohio App. 8th Dist. 2011) (citations omitted).

Therefore, Defendants are entitled to summary judgment as to Counts Three and Seven.

E.  Discrimination claims

Banks contends in Count Four that all Defendants violated Ohio Rev. Code § 4112.02(A) by denying his requests for reasonable accommodation, failing to engage in the interactive process regarding his disabilities and then terminating him without justification. R. 9, PageID#: 88-89. In Count Five, Plaintiff maintains that the Defendants retaliated against him when he requested reasonable accommodation for his disability. *Id*., PageID#: 90. Count Six alleges that the individual Defendants (Kutschinski, Kramer, Chuck and Trevor Gile) aided and abetted Foundation and Motor Cars in discriminating against Banks. *Id.*, PageID#: 91.

As an initial matter, Defendants assert that Banks has failed to establish as a threshold issue that he was disabled. R. 51, PageID#: 881-86. Ohio Rev. Code § 4112.01(A)(13) defines what constitutes "disability" for purposes of the statute. Ohio courts interpret that section of the statute as meaning that a person will only be disabled when he or she has a mental or physical impairment that substantially limits at least one major life activity. *Barreca v. Travco Behavioral Health, Inc*., 2014 WL 3734186, at *3 (Ohio App. 11th Dist. July 28, 2014) (citation omitted). As such, a physical impairment alone may not necessarily constitute a disability. *Id*., at *4 (citation omitted).

*Barreca* presents the highly analogous case of a plaintiff invoking Ohio Rev. Code § 4112(A) in a disability claim centered on her having MS. *Id*. at * 1. While initially agreeing that MS is listed as a physical impairment in the Ohio statute, *id.,* at *4, *Barreca* then pointed to the Ohio case law which holds that a diagnosis of MS by itself is not proof of disability, the establishing of which requires additional proof that the impairment substantially limits one or more major life activities. *Id*. *Barreca* noted that the plaintiff there did not meet that standard where her physician stated that she did not have any limitations due to MS and she herself admitted that MS "has no substantial affect [sic] upon her ability to walk, see or drive a motor vehicle." *Id*.

Under these circumstances, the *Barreca* defendant did not need to submit further evidence to obtain summary judgment since, given the evidence from the plaintiff, there was no factual dispute over whether the plaintiff could meet the statutory definition of disability. *Id*. "[B]ecause [plaintiff] cannot fulfill the first element for prima facie claim of disability discrimination, [defendant] was entitled to prevail on that claim [in a motion for summary judgment]." *Id*.

The same analysis and result apply here.

When addressing these issues, the Court notes that Banks has submitted a Declaration whereby he attempts to create an issue of fact as to whether his MS did substantially limit one or more major life activities at the time in question, *see*, R. 48-2 (Banks Declaration), PageID#: 806. Specifically, items 10-13 in that Declaration state that: Banks has "fatigue, foot drop and depression' (item 10); MS "has affected [sic] my ability to care for myself, perform manual tasks and walking" (item 11); MS at "times" renders Banks unable to control many bodily functions (item 12); and Banks "regularly discussed" his need for an accommodation in his

27

work schedule due to fatigue related to MS with Defendants Chuck Kramer and Kevin Kutschinski. The Declaration also stated that Banks "disclosed" to Jeff Jeans, Foundation's HR consultant, that he "suffered from MS." *Id.*

As Defendants note, there is no Rule 56 evidence in this Declaration to establish that any purported effects from MS were present during the relevant time nor that the listed effects were substantial. R. 51, PageID#: 884. Moreover, the Declaration here contradicts Banks' deposition testimony, cited earlier, that his initial request to Foundation for an accommodation never mentioned MS in connection with fatigue and that he only told Foundation of his MS nearly a month after he requested the accommodation in his schedule. R. 43-1, PageID#: 377. The federal district court in *Salekinv McDonough*, 2023 WL 5538981, at *2 (M.D. Tenn. Aug. 28, 2023) properly noted that self-serving affidavits are "problematic" when a party attempts to create a genuine issue of material fact by submitting such an affidavit after a summary judgment motion has been filed and the affidavit "essentially contradicts his earlier deposition testimony."

More important still, Defendants here fully granted the sought-after accommodation of lesser hours to deal with fatigue and Banks admits that this was the only accommodation he requested.[3] R. 43-2, PageID#: 623. Moreover, in a February 13, 2019 email to Chuck Kramer and Kevin Kutschinski, and as noted above, Banks affirmatively stated that "very recently I was diagnosed with MS (does not [a]ffect work at all*)* though I have 0 symptoms and I look to be as healthy as I am now in 20 years." R. 44-8, PageID#: 711. Banks testified in his deposition that he only learned that fatigue and foot drop were MS symptoms on the same day he was

---

[3] Banks was asked at his deposition whether a request for "a reasonable schedule" was "the only accommodation that you requested." R. 43-2, PageID#: 623. He answered: "That I recall. There may have been more, I just don't recall. I do recall that one." *Id*. He also testified that he could not recall ever telling anyone besides Chuck Kramer and Kevin Kutschinski that he had MS. *Id*., PageID#: 625.

terminated and was going to tell Foundation but never got the chance. R. 48-1, PageID#: 785-86.

Simply put, Banks, in his own words and just days before his termination, for the first time directly told the senior officers at Foundation about his MS and stressed to them that his condition had "0 symptoms" and that it "does not [a]ffect my work at all." He also testified that he learned that symptoms like fatigue and foot drop were manifestations of MS on the day he was terminated, and he never had the opportunity to tell that to Foundation. Although Banks stated in his deposition that he talked about "fatigue and my schedule all the time" with Foundation, R. 48-1, PageID#: 786, there is clear evidence from that same deposition that prior to his termination Banks did not know that any fatigue, whether of disabling intensity or not, was related to MS and that, in turn, he never communicated nor could ever have communicated such a relationship to Foundation. *Id*., PageID#:787.

Taken together, the evidence is clear Foundation first learned of Banks' MS just prior to his termination and was specifically assured by Banks that it did not affect his work at all. General statements about work schedules and fatigue, without more, do not show that Banks informed Foundation that his fatigue was related to any alleged disability nor that it had progressed to where it substantially effected his work. Further, there is uncontroverted evidence that prior to termination neither Banks nor Foundation knew that symptoms such as fatigue in whatever degree of severity were in any way related to MS and so might be evidence of a disability under the applicable Ohio law.[4]

---

[4] Banks attempts to argue that to show disability he is only required to show that his MS affected some major life activity, which may or may not include a work-related activity. R. 48, PageID#: 746. Yet, notwithstanding that, it remains true, as Banks points out in the next paragraph of his filing, that in order to make out a prima facie claim of disability discrimination, he must show that Defendants knew or had reason to know of his disability. *Id.*, (citation omitted). It is here, as discussed above, that Banks fails to demonstrate a material issue of fact that Defendants

Accordingly, because the Rule 56 evidence shows that Banks cannot make out a prima facie case of being under a disability pursuant to the relevant statute, all Defendants are entitled to summary judgment on all the discrimination claims – Counts Four, Five and Six - in the Amended Complaint.

F.  Remand

As discussed earlier, the remaining contract claim is solely against the Foundation Defendants and solely arises under the temporary terms of the Pay Plan contract. As such, as also detailed above, that claim involves potential damages in a maximum amount of $31,900.00.[5]

As is well-known, the diversity statute requires that the amount in controversy exceed $75,000.00 exclusive of interest and costs. 28 U.S.C. § 1332(a). Generally, the amount claimed by the plaintiff controls, but if it becomes clear that plaintiff's "claim could never have amounted to the sum necessary to give jurisdiction there is no injustice in dismissing the suit." *Fanning v. Fox Meadow Farm, Inc*., 164 F.Supp. 2d 921, 923 (E.D. Mich. 2001) (citation and internal quotation omitted). In that case, the district court found that "[t]he only damages for which Plaintiffs have admissible evidence show that the amount in controversy at the time of filing was less than $75,000.00." *Id*. Thus, the court dismissed the action. *Id*.

Here, as noted, Banks initially brought his claims in state court. It was Defendant who then removed the case. Thus, upon now finding that the amount in controversy at the time this matter was filed and removed is less than $75,000.00 the appropriate remedy is remand.

---

knew or had reason to know of any impact on him from his MS.
[5] On this record and under the summary judgment standard, it is not necessary here to explore what effect, if any, Banks' decision not to claim relocation expenses (R. 48-1, PageID#: 791) might have on his right to now receive them, nor to determine if Banks has already been paid some or all of the living expenses to which he is entitled. *See,* R. 43, PageID#: 427-28.  Those matters are for later consideration.

G. Other open motions

In addition to the summary judgment motion, the parties have filed motions to quash a third-party subpoena (R. 39); to extend the deadline for expert reports (R. 40); to strike a declaration attached to Plaintiff's partial memorandum in opposition to the motion for summary judgment (R. 50); and for leave to file a sur-reply (R. 52). The Court finds no grounds to further amend the case management schedule or to consider the merits of these motions, which are denied as moot.

V. CONCLUSION

Therefore, for the reasons stated, Defendants' motion for summary judgment (R. 44) is granted in part as is more fully set forth above. The remaining breach of contract claim is remanded to the Ohio court. Other pending motions are denied as moot. Thus, nothing further remains before this Court.

**IT IS SO ORDERED.**

Dated: March 28, 2024                     _/s/ David A. Ruiz_

David A. Ruiz
United States District Judge